IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| WACHOVIA BANK, NATIONAL ASSOCIATION, successor by merger to SouthTrust Bank | ) ) ) | 2007 DEC 18 P 3: 47 |
| Plaintiff, | ) ) ) | DEBRA P. HACKETT, CLK U.S. DISTRICT COURT MIDDLE DISTRICT ALA |
| v. | ) ) | Case No. 3:07-CV-1097-WC |
| 5300 PEACHTREE, L.P., MILES E. HILL, JR. and FRED BENNETT, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

**COMES NOW** the plaintiff in this action, Wachovia Bank, National Association, in its capacity as successor by merger to SouthTrust Bank ("Wachovia" or "Plaintiff"), and for its complaint against defendants Miles E. Hill, Jr. ("Hill"), Fred Bennett ("Bennett," and together with Hill, the "Guarantors") and 5300 Peachtree, L.P. (the "Borrower," and together with the Borrower, the "Defendants") states as follows:

### JURISDICTION AND VENUE

1.    Plaintiff Wachovia is a national banking association having its principal place of business in North Carolina.

2.    Defendant Borrower is a limited partnership organized and existing under the laws of the State of Alabama with its principal place of business in Lee County, Alabama.

    (a)    The general partner of Borrower is 5300 Peachtree Partners, LLC ("LLC"), a limited liability company organized and existing under the laws of the State of

Alabama with its principal place of business in Lee County, Alabama.  The sole member of LLC is Hill, who is a citizen of the State of Alabama.

        (b)    The limited partners of Borrower are LLC and Euro Atlanta Development Group, L.L.C. ("Euro").  The citizenship of the member of LLC is set forth above.  Upon information and belief, the sole member of Euro is Eike Jordan, who is a citizen of the State of Georgia.

       3.    Defendant Hill is a citizen of the State of Alabama, and resides in Lee County, Alabama.

       4.    Defendant Bennett is a citizen of the State of Alabama, and resides in Lee County, Alabama.

       5.    The amount in controversy against each of the Defendants, exclusive of interest and costs, exceeds $75,000.00, and complete diversity exists between Wachovia on the one hand and the Defendants on the other.

       6.    This Court has original jurisdiction of this case pursuant to 28 U.S.C. § 1332.

       7.    Venue is proper pursuant to 28 U.S.C. § 1391(a).

## STATEMENT OF FACTS

       8.    Wachovia made a construction loan available to the Borrower in the original principal amount of $18,843,294.00.  Said construction loan is governed by the terms of that certain Loan Agreement dated as of September 30, 2003, between Wachovia and the Borrower (the "Construction Loan Agreement").  A true and correct copy of the Construction Loan Agreement is attached hereto as **Exhibit A** and is incorporated by reference.

       9.    The Construction Loan Agreement was amended from time to time, and most recently amended by that certain Third Modification to Loan Agreement dated as of March 21, 2007, between Wachovia and the Borrower (the "Third Loan Agreement Modification"), which,

among other things, increased the maximum stated principal amount of said construction loan to the sum of $24,146,972.78 (as so increased, the "Loan"). A true and correct copy of the Third Loan Agreement Modification is attached hereto as **Exhibit B** and is incorporated by reference.

10.    The Borrower's obligation to repay the Loan, with interest thereon, is evidenced by a Promissory Note dated September 30, 2003, payable by the Borrower to the order of Wachovia in the original principal amount of $18,843,294.00 (the "Note"). A true and correct copy of the Note is attached hereto as **Exhibit C** and is incorporated by reference.

11.    The Note was amended from time to time, and most recently amended pursuant to that certain Third Note Modification Agreement dated as of March 21, 2007, between Wachovia and Borrower (the "Third Note Modification Agreement"), which, among other things, increased the stated principal amount of the Loan to the sum of $24,146,972.78 and modified the payment terms of the Loan. A true and correct copy of the Third Note Modification Agreement is attached hereto as **Exhibit D** and is incorporated by reference.

12.    In addition to the Borrower's obligation to pay the principal of and interest on the Loan, the Loan Agreement and the Note provide that the holder of the Note is entitled to recover its costs and expenses, including attorneys' fees, incurred in collecting the Loan.

13.    In order to induce Wachovia to make the Loan to the Borrower, the Guarantors jointly, severally and unconditionally guaranteed payment of the Loan and all other sums due under the loan documents evidencing and securing the Loan. This guaranty is evidenced by that certain Guaranty Agreement dated as of September 30, 2003 (the "Guaranty," and collectively with the Loan Agreement, the Third Loan Agreement Modification, the Note the Third Note Modification, and all other documents evidencing the Loan and the collateral therefor, the "Loan

Documents").  A true and correct copy of the Guaranty is attached hereto as **Exhibit E** and is incorporated by reference.

14.    In addition to the Guarantors' obligations under the Guaranty to pay the principal of and interest on the Loan, the Guaranty provides that the Guarantors shall also be liable for costs and expenses, including attorney's fees, incurred in collecting the obligations due under the Loan Documents.

15.    Pursuant to the terms of the Third Note Modification, the Loan matured on November 15, 2007.

16.    The Defendants are in default in the performance of their respective obligations under the Loan Documents, including without limitation, the failure to pay all amounts when due under the terms of the Loan Documents.  On December 4, 2007, Wachovia made written demand on the Defendants to fulfill their respective obligations under the Loan Documents and for payment of the entire unpaid balance of the Loan (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit F** and is incorporated by reference.

17.    The Defendants have failed to honor their respective obligations under the Loan Documents despite the Demand Letter and earlier communications making clear that the maturity date of the Loan would not be extended.

18.    The Defendants' obligations under the Loan Documents include the principal sum of $21,348,848.04, unpaid interest thereon, late fees, exit fees, expenses of collection, including attorneys' fees, and the costs of this action.

## COUNT I

## (BREACH OF CONTRACT BY BORROWER)

19.    Wachovia incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

20.    The Borrower is in default of its obligations under the Loan Documents.

21.    Despite written demand and the maturity of the Loan, the Borrower has failed to pay Wachovia the amounts due under the terms of the Loan Documents.

**WHEREFORE**, Wachovia demands judgment against the Borrowers for the principal indebtedness outstanding under the Loan, plus accrued and accruing interest, late charges, and expenses of collection, including attorneys' fees, as permitted by contract and O.C.G.A. § 13-1-11.

## COUNT II

### (BREACH OF CONTRACT BY GUARANTORS)

22.    Wachovia incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

23.    The Guarantors are in default in the performance of their respective obligations under the Loan Documents.

24.    Despite written demand, the Guarantors have failed to pay Wachovia the amounts due under the terms of the Loan Documents.

**WHEREFORE**, Wachovia demands judgment against the Guarantors, jointly and severally, for the principal indebtedness outstanding under the Loan, plus accrued and accruing interest, late charges, and expenses of collection, including attorneys' fees as permitted by contract and O.C.G.A. § 13-1-11.

## COUNT III

### (ATTORNEYS' FEES)

25.    Wachovia incorporates and re-alleges all preceding paragraphs as if fully set forth herein.

1622702 v1                                          5

26.    Under the terms of the Loan Documents, the Defendants are obligated to pay Wachovia's cost of collecting the amounts due under the Loan Documents, including attorneys' fees and other costs.

27.    The Loan Documents provide for the application of Georgia law.

28.    In the Demand Letter, Wachovia provided the statutory notice required by O.C.G.A. § 13-1-11 to inform the Defendants of their opportunity to pay all amounts due and owing under the Loan Documents within ten (10) days without incurring any liability for attorneys' fees. The 10-day period under Georgia law has passed and the Defendants are now liable under the Loan Documents, and as provided in O.C.G.A. § 13-1-11, for the attorneys' fees and other costs incurred by Wachovia in collecting the amounts due from the Defendants.

**WHEREFORE**, Wachovia demands judgment against the Defendants, jointly and severally, for attorneys' fees as permitted by contract and O.C.G.A. § 13-1-11.

D. Christopher Carson (CAR099)
Jason D. Woodard (WOO095)
Jennifer A. Harris (HAR273)
Counsel for Wachovia Bank, N.A.

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street
Suite 3400 - Wachovia Tower
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

**Defendants' Addresses:**
5300 Peachtree, L.P.
c/o Miles Hill, its Registered Agent
730 North Dean Road, Suite 200
Auburn, AL  36830

1622702 v1                                    6

Miles E. Hill, Jr.
730 North Dean Road, Suite 200
Auburn, AL  36830

Fred Bennett
730 North Dean Road, Suite 200
Auburn, AL  36830

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** is entered into as of the _30_ day of September, 2003, by and between **5300 PEACHTREE, L.P.**, an Alabama limited partnership ("**Borrower**"), and **SOUTHTRUST BANK**, an Alabama banking corporation ("**Lender**").

## RECITALS:

Pursuant to a Commitment dated as of August 27, 2003 (the "**Commitment**"), Lender has agreed, subject to the terms and conditions set forth therein, to make available to Borrower a construction loan in the maximum principal amount of $18,843,294.00 (the "**Loan**"), which Loan was requested by Borrower to finance the development and construction of the Property hereinafter described. Borrower and Lender have entered into this Loan Agreement to establish the terms and conditions of the disbursement of the Loan.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants, agreements, and warranties hereinafter set forth and of the sum of Ten Dollars ($10.00) in hand paid by each party hereto to the other, Borrower agrees with Lender, and represents and warrants to Lender, and Lender agrees with Borrower, as follows:

## ARTICLE ONE - DEFINITIONS OF GENERAL APPLICATION

In addition to any other terms that are defined in this Loan Agreement, the following terms shall have the following meanings unless the context hereof otherwise indicates:

"**Advance**" means any advance of the Loan made by Lender pursuant to the terms of this Loan Agreement.

"**Affiliate**" means, as to any Person, any other Person (i) who directly or indirectly controls, is controlled by, or is under common control with such Person, (ii) who is a substantial creditor, customer, or supplier of such Person, (iii) who is a director, officer, manager, partner, member, shareholder, employee, or employer of such Person, or (iv) who is a member of the immediate family of such Person. "Control," as used in this definition, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, including the power to elect a majority of the directors or trustees of a corporation or trust, as the case might be.

"**Assignment**" means the Assignment of Leases and Rents of even date herewith with respect to the Property executed by Borrower for the benefit of Lender, as from time to time amended, replaced, restated, supplemented, or consolidated pursuant to the applicable terms thereof.

"**Authorized Representative**" means the Person or Persons designated as such in the Disbursement Authorization. If more than one Person is designated as an Authorized Representative, then the provisions of this Loan Agreement relating to the Authorized Representative shall apply to each such Person individually, and not jointly with any or all other Persons designated as the Authorized Representative.

**EXHIBIT**

tabbies®

_A_

"**Borrower**" means 5300 Peachtree, L.P., an Alabama limited partnership, and its successors and permitted assigns under the terms of this Loan Agreement.

"**Borrower Party**" means each of Borrower, any general partner of Borrower, and Guarantor, and "**Borrower Parties**" means all of such Persons collectively.

"**Budget**" means the itemized budget of construction and non-construction costs to be incurred by Borrower in connection with the Property, as attached hereto as **Exhibit A**, as the same might hereafter be amended or supplemented pursuant to the terms of this Loan Agreement.

"**Business Day**" means a day which is not a public holiday and on which banks in Atlanta, Georgia, are customarily open for business.

"**Closing Date**" means the date on which the initial Advance is made by Lender to Borrower hereunder.

"**Collateral**" means all real and personal property now or hereafter encumbered by the Security Documents, including all after-acquired property and all other collateral from time to time given by Borrower or any other person to secure the Obligations.

"**Commitment**" shall have the meaning assigned to such term in the recitals to this Loan Agreement.

"**Completion Deadline**" means March 31, 2005 (18 months after the date hereof).

"**Construction Contracts**" means all contracts and agreements between Borrower and any third party relative to the design, engineering, construction, operation, and/or maintenance of the Improvements on the Land, and all amendments to, and extensions and restatements of, said contracts and agreements.

"**Default**" means the occurrence of any event or circumstance that, but for only the giving of any notice by Lender or the passage of any cure period (or both) required under the terms of this Loan Agreement or any other Loan Document, would constitute an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in the Note.

"**Design Architect**" means the Person initially selected by Borrower as the design architect for the Property, and any replacement architect for the Property hereafter approved in writing by Lender in accordance with the applicable provisions of the Loan Documents.

"**Disbursement Authorization**" means the Disbursement Authorization dated of even date herewith executed by Borrower for the benefit of Lender, as from time to time amended, replaced, restated, supplemented, restated, or consolidated pursuant to the applicable provisions hereof.

"**Engineer**" means the Person and Persons initially selected by Borrower as the civil engineer for the Property, and any replacement civil engineer for the Property

2

hereafter approved in writing by Lender in accordance with the applicable provisions of the Loan Documents.

"**Equity Contribution**" means the total amount of $4,337,415.00, which shall be paid or evidenced as follows: (i) cash of $3,987,415.00, plus (ii) deferral of Borrower's (or its affiliates) developer fee of $350,000.00, plus any additional contribution or deposits required of Borrower pursuant to the provisions of Section 5.2.3 hereof. The cash portion ($3,987,415.00) of the Equity Contribution shall be paid by Borrower pursuant to the terms and conditions of the Pledge Agreement pursuant to which funds on deposit with Lender shall be disbursed by Lender in payment of Project costs prior to any disbursement of Loan funds.

"**Event of Default**" shall have the meaning assigned to such term in Article Seven hereof.

"**GAAP**" means general accepted accounting principles, consistently applied.

"**General Contractor**" means the Person initially selected by Borrower as the general contractor for the Property, and any replacement general contractor of the Property hereafter approved in writing by Lender in accordance with the applicable provisions of the Loan Documents.

"**Governmental Authority**" means any court, board, agency, commission, office, or authority of any nature whatsoever for any governmental or quasi-governmental unit (federal, state, county, district, municipal, city, or otherwise), whether now or hereafter in existence.

"**Guarantor**" means Miles E. Hill, Jr. and Fred Bennett, jointly and severally.

"**Guaranty Agreement**" means each agreement or instrument at any time executed by Guarantor for the benefit of Lender with respect to the Obligations, as from time to time amended, replaced, restated, supplemented, or consolidated pursuant to the applicable term thereof.

"**Improvements**" means the buildings, structures (surface and subsurface), and other improvements and fixtures now or hereafter situated on or attached to any portion of the Land, which Improvements shall consist of a 244-unit apartment complex, together with other related amenities and improvements, and to be constructed and completed by Borrower pursuant to and substantially in conformity with the Plans and Specifications and in accordance with the terms of this Loan Agreement.

"**Land**" means the parcel(s) or tract(s) of land lying and being in DeKalb County, Georgia, more particularly described in the Security Instrument.

"**Leases**" means any and all existing and future leases, subleases, rental agreements, and other occupancy agreements, whether oral or written and whether or not of record, for the use or occupancy of any portion of the Property, together with all amendments to, and renewals and extensions of, said leases, subleases, rental agreements, and other occupancy agreements, all guaranties with respect thereto, all work letter agreements, improvements agreements, and other agreements with any Tenant, all default letters or notices, estoppel letters, rental adjustment notices, escalations notices, and other

156484 v3                                                3

correspondence in regard thereto, and all credit reports and accounting records in regard thereto.

"**Legal Requirement**" and "**Legal Requirements**" means, as the case might be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations, and requirements, even if unforseen or extraordinary, of every duly constituted Governmental Authority (but excluding those which by their terms are not applicable to and do not impose any obligation on Borrower or the Property), including, without limitation, the requirements and conditions of any Permits and all covenants, restrictions, and conditions now or hereafter of record that might be applicable to Borrower or the Property or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair, or reconstruction of the Property, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the Americans with Disabilities Act and regulations promulgated thereunder) or results in interference with the use or enjoyment of the Property or (ii) requires Borrower to carry insurance other than as required by the provisions of this Loan Agreement, the Leases, and the Loan Documents.

"**Lender's Consultant**" means the Person designated as such from time to time by Lender.

"**Loan**" means the loan in the maximum principal amount of $18,843,294.00 made by Lender to Borrower pursuant to the terms and conditions of this Loan Agreement, as evidenced by the Note.

"**Loan Account**" means the depositary account established by Borrower with Lender, as more particularly identified in the Disbursement Authorization.

"**Loan Agreement**" means this Loan Agreement, as from time to time amended, replaced, restated, supplemented, restated, or consolidated pursuant to the applicable provisions hereof.

"**Loan Documents**" means collectively this Loan Agreement, the Note, the Security Documents, the Guaranty Agreement, and any and all other documents now or hereafter executed by Borrower, Guarantor, or any other Person which evidences, relates to, is executed in connection with, or secures the Loan.

"**Management Agreement**" means any management agreement for the Property hereafter approved in writing by Lender pursuant to the applicable provisions of the Loan Documents.

"**Manager**" means the Person initially selected by Borrower to manage the Property pursuant to the Management Agreement, and any replacement manager of the Property hereafter approved in writing by Lender in accordance with the applicable provisions of the Loan Documents.

"**Material Adverse Effect**" means, with respect to any circumstance, act, condition, or event of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, or circumstance or circumstances, whether or not related, a material adverse change in or a

materially adverse effect upon any of (a) the business, operations, property, or condition (financial or otherwise) of any Borrower Party, (b) the present or future ability of any Borrower Party to perform the Obligations for which it is liable, (c) the validity, priority, perfection or enforceability of this Agreement or any other Loan Document or the rights or remedies of the Lender under any Loan Document, or (d) the value of, or the Lender's ability to have recourse against, any Collateral.

"**Note**" means the Promissory Note of even date herewith evidencing Borrower's promise to repay the Loan with interest thereon, as the same might hereafter be amended, extended, renewed, replaced, supplemented, restated, or consolidated pursuant to the applicable provisions thereof.

"**Obligations**" means the aggregate of all principal and interest owing from time to time under the Note, and all expenses, charges, and other amounts from time to time owing under the Note, this Loan Agreement, or any of the other Loan Documents, and all covenants, agreements, and other obligations from time to time owing to, or for the benefit of, Lender pursuant to the Note, this Loan Agreement, and the other Loan Documents.

"**Operating Statement**" shall mean any operating statement, including income and expense statement and statement of cash flows, with respect to the Property, of which shall be prepared in accordance with GAAP throughout the periods covered by such statement and which fairly present the financial condition of Borrower and the Property as of their respective dates and the results of operations and changes in financing position of Borrower and the Property for the periods then ended. Each Operating Statement shall be prepared on an accrual basis or, in the alternative, Borrower shall provide Lender all data necessary to constitute the adjustments necessary to convert such Operating Statement to accrual basis Operating Statement.

"**Permits**" means all licenses, permits, certificates, approvals, authorizations, and registrations required by or obtained from any Governmental Authority with respect to the construction, ownership, rental, operation, use, or occupancy of the Property, including, without limitation, business licenses, zoning approvals and variances, food and beverage service licenses, and licenses to conduct business.

"**Permitted Change Order**" means any change or amendment to any Construction Contract or the Plans and Specifications which alone does not increase or decrease the costs of the Property by $10,000.00 or more or, in combination with all prior Permitted Change Orders, does not increase or decrease the costs of the Property by $150,000.00 or more.

"**Permitted Encumbrances**" means collectively (i) liens at any time existing in favor of Lender, (ii) the matters affecting title to the Land described in title insurance commitment issued in favor of Lender in connection with the execution and delivery of this Loan Agreement, provided that such matters are accepted by Lender in writing in Lender's discretion, (iii) statutory liens incurred in the ordinary course of business for the purchase of labor, services, materials, equipment, or supplies, or with respect to workmen's compensation, unemployment insurance, or other forms of governmental insurance or benefits, which are not delinquent or are paid or bonded and removed of record in a manner satisfactory to Lender, and (iv) liens for real property taxes,

assessments, or governmental charges or levies for the current year, the payment of which is not delinquent.

"Person" means any individual, corporation, partnership, joint venture, association, trust, unincorporated organization, and any Governmental Authority.

"Plans and Specifications" means the plans and specifications for the Improvements, as the same might be amended or supplemented from time to time in accordance with the provisions of this Loan Agreement.

"Pledge Agreement" means the Assignment and Pledge Agreement to be executed by Borrower in favor of Lender contemporaneously herewith as security for the payment of Borrower's Equity Contribution pursuant to which Borrower shall assign and pledge to Lender the amount of $3,987,415.00 in funds presently deposited, or to be deposited, with Lender, which funds shall be disbursed by Lender in payment of Project costs prior to any disbursement of Loan funds.

"Pledged Account" means the 5300 Peachtree L.P. Investor Escrow Account with Lender, Account number _____, the balance of which is presently $_____.

"Property" means the Land and the Improvements collectively.

"Rent Roll" shall mean each rent roll for the Property delivered by Borrower pursuant to this Loan Agreement, each of which shall show (i) a description (by rentable square feet and location or unit number) of the lease space; (ii) the name of the current Tenant; (iii) the commencement and expiration dates of the original Lease and any renewal terms thereof; (iv) the rents during the term thereof; (v) all rents prepaid by Tenant; (vi) all concessions, allowances, credits, and abatements to which the Tenant is entitled; (vii) the security deposit given by Tenant and interest accrued thereon; and (viii) the identification of any security given to secure Tenant's obligations including, without limitation, the identity of any guarantor of the Lease. Each such Rent Roll shall also provide (x) a statement of occupancy levels and delinquent rents and (ii) a statement that no portion of the Improvements are subject to any governmental assistance programs, housing assistance payment contracts, so-called "Section 8" contracts, or any other low-income housing laws, rules, regulations, programs, or rulings, or any governmental or quasi-governmental low-income housing programs.

"Retainage" means ten percent (10%) of the actual costs of the completed construction of the Improvements, as determined by Lender's Consultant, until the Improvements are fifty percent (50%) complete, as determined by Lender's Consultant, and thereafter retainage shall be 5%. There shall be no retainage for Stored Materials. The Retainage shall in no event, and notwithstanding anything to the contrary set forth in this Loan Agreement, be less than the amount actually held back by Borrower from contractors, subcontractors, and materialmen engaged in the construction of the Improvements.

"Security Documents" means collectively the Security Instrument, the Assignment, the Letter of Credit, and any and all other documents, instruments, or financing statements heretofore or hereafter executed by Borrower, Guarantor, or any other Person for the benefit of Lender as security for all or any part of the Obligations.

"**Security Instrument**" means the Deed to Secure Debt and Security Agreement of even date herewith executed by Borrower for the benefit of Lender with respect to the Property, as the same might hereafter be amended, extended, replaced, supplemented, restated, or consolidated pursuant to the applicable provisions thereof.

"**Stored Materials**" means materials that are to be used at a future date in the construction of the Improvements and comply with the requirements of Article Two hereof.

"**Tenant**" means the tenant under any Lease.

"**Title Company**" means the issuer of the mortgagee's policy of title insurance with respect to the Loan, as approved by Lender in its discretion.

## ARTICLE TWO - DISBURSEMENT OF THE LOAN

2.1     <u>Pledged Account</u>.  In partial satisfaction of Borrower's Equity Contribution, Borrower shall assign and pledge to Lender the Pledged Account.  The present balance in the Pledged Account is $_____ (the "**Pledged Amount**").  Lender will release funds from the Pledged Account for application to Project costs as set forth in the Budget in accordance with the same procedures for disbursement of advances under the Loan as set forth herein. No Loan funds will be advanced by Lender until such time as the entire Pledged Amount has been disbursed toward the payment of Project costs.

2.1     <u>Disbursement Procedure</u>.  Lender agrees on the terms and conditions, and relying on the representations, set forth in this Loan Agreement to lend to Borrower, and Borrower agrees to borrow from Lender, an amount not to exceed the Loan amount.  Subject to compliance by Borrower with all of the terms and conditions of this Loan Agreement, the Loan shall be disbursed in several Advances at such times and in such amounts as Lender shall determine in accordance with the following procedures:

2.1.1     Not less than five (5) Business Days prior to the date on which Borrower desires an Advance, Borrower shall submit to Lender a requisition on a form approved by Lender and accompanied by a cost breakdown on AIA forms G-702 and G-703 (a "**Requisition**"). The Requisition will include (i) the Budget and the itemized schedule of values prepared by General Contractor of the total "hard costs" of construction, as approved by Lender (the "**Schedule of Values**"), (ii) all costs incurred for construction and nonconstruction expenses in connection with the Improvements to the date of the Requisition, which costs have been itemized under the applicable line items of the Budget and the Schedule of Values, and (iii) the percentage of completion of each line item on the Budget and the Schedule of Values.  The accuracy of the cost breakdown and percentage completion in the Requisition shall be certified by Borrower, Design Architect, and General Contractor and must be approved by Lender's Consultant. Borrower appoints the Authorized Representative as its agent to submit Requisitions.

2.1.2     The construction for which costs are included in any Requisition must be reviewed and approved by Design Architect and Lender's Consultant, who shall certify to Lender as to the approval of the construction, the cost of completed construction, the percentage of completion, and the compliance with the Plans and Specifications.

2.1.3    The maximum allowable Advance shall be allowable nonconstruction expenses actually incurred within the amounts set forth in the Budget, plus the lesser of (i) the actual cost of the completed portion of the Improvements or (ii) the scheduled value of each completed portion of the Improvements as set forth in the Schedule of Values.  No Advance shall be made for duplication of work for which an Advance has been previously made, work that does not conform to the Plans and Specifications, or work that is unsatisfactory in the reasonable opinion of the Lender's Consultant.  The Advance to be made shall be the maximum allowable Advance minus the sum of (x) amounts previously advanced by Lender under the Loan and (y) the Retainage.

2.1.4    Advances shall be made for costs on each line item shown in the Budget only up to the amount set forth in the Budget for such line item.  A reallocation among line items may not be made unless the prior written consent of Lender is obtained, provided that (i) Lender may unreasonably withhold its consent to any reallocation which results in a change in the Interest Reserve (as defined in Section 2.2.1 below), and (ii) without Lender's consent, Borrower shall be entitled to reallocate any savings in a completed line item (as confirmed by Lender's Consultant) to another line item other than (A) the Construction Interest Reserve and (B) any line item representing amounts payable to Borrower or an Affiliate of Borrower.

2.1.5    Notwithstanding anything to contrary in this Loan Agreement, Lender reserves the right to limit the total amount advanced on the Loan at any time to an amount equal to the amount which, when deducted from the total amount of the Loan, leaves a balance to be advanced equal to the cost of completion of the Improvements and the remaining nonconstruction expenses relating to the Loan and the Improvements, as reasonably estimated by Lender, including, but not limited to, amounts to become due pursuant to the Construction Contracts, amounts to complete the Improvements but not yet included in any of the Construction Contracts, estimated interest costs, fees, and expenses of Lender and its counsel, estimated fees for Permits, estimated architectural and engineering fees of Borrower and Lender's Consultant, and estimated recording and title insurance costs, plus the Retainage applicable to the total amount of the Loan, all as reasonably determined by Lender from time to time.

2.1.6    No Advance shall be made for Stored Materials unless Lender received satisfactory evidence that the Stored Materials for which Borrower desires an Advance are either (i) stored in a bonded warehouse approved by Lender and available for inspection by the Lender's Consultant or (ii) stored at the Land in a locked and otherwise secure storage arrangement acceptable to Lender and insured in an amount acceptable to Lender.  In no event shall Lender make an Advance to pay for Stored Materials more than ninety (90) days prior to the date such Stored Materials are to be used in the construction of the Improvements.  Borrower shall provide Lender with a detailed listing of and invoices for all Stored Materials.

2.2    <u>Restrictions Applicable to Specific Budget Items</u>.  In addition to any other conditions and restrictions applicable to Advances generally set forth in this Loan Agreement, the following restrictions and conditions shall apply to Advances under the specific Budget line items described below:

2.2.1    The line item designated as "Interest Reserve" in the Budget constitutes a reserve for the payment of accrued interest on the Loan until such time as the Improvements are complete (the "**Interest Reserve**").  Subject to the terms and

conditions of this Loan Agreement, the Interest Reserve shall be advanced by Lender, following an appropriate Requisition from Borrower, as necessary to pay accrued interest on the Loan when due under the Note, provided that Advances from the Interest Reserve shall be made only to the extent that the cash flow from the leasing of the Property is insufficient to pay accrued interest on the Loan, notwithstanding that the Interest Reserve has not been fully advanced by Lender. Interest shall be paid by Borrower on that portion of the Interest Reserve actually disbursed by Lender. If at any time the Interest Reserve is reduced to an amount that is less than the total estimated amount of interest to accrue on the Loan during the remainder the Construction Period, Borrower shall, within ten (10) days of written notice from Lender, deposit cash with Lender in the amount of such deficiency.

2.2.2    The line item designated as "Operating Deficit" in the Budget constitutes a reserve for the payment of operating deficits incurred in connection with the Property following the completion of the Improvements and the commencement of operations (the "**Operating Deficit Reserve**"). Subject to the terms and conditions of this Loan Agreement, the Operating Deficit Reserve shall be advanced by Lender, following an appropriate Requisition from Borrower, as necessary to pay operating deficits for the Property. Advances from the Operating Deficit Reserve shall be made only to the extent that the cash flow from the leasing of the Property is insufficient to pay the reasonable and customary expenses incurred by Borrower in connection with the marketing, lease-up, and operation of the Property, as determined by Lender based upon operating statements and other information furnished by Borrower, notwithstanding that the Operating Deficit Reserve has not been fully advanced by Lender. Interest shall be paid by Borrower on that portion of the Operating Deficit Reserve actually disbursed by Lender.

2.2.3    The line items designated as "Building Contingency" and "Soft Costs Contingency" in the Budget constitute reserves for the payment of unanticipated construction and non-construction costs, respectively, associated with the Property (the "**Contingency Reserve**"). The Contingency Reserve shall be disbursed by Lender at its reasonable discretion to effectuate the purposes of this Loan Agreement. Interest shall be payable by Borrower to Lender on that portion of the Contingency Reserve actually disbursed by Lender. The Contingency Reserve shall be included in the computation of the undisbursed portion of the Loan for purposes of determining whether the undisbursed portion of the Loan shall be sufficient to complete the construction of the Improvements.

2.2.4    The line item designated as "Developer's Fee" in the Budget represents the amount of developer fees to be paid to Borrower (or Affiliates of Borrower) in connection with the Property (the "**Developer's Fee Reserve**"). Said entire Developer's Fee ($350,000.00) is deferred by Borrower to Lender as partial payment of Borrower's Equity Contribution.

2.3    Direct Advances. Regardless of whether Borrower has submitted a Requisition therefor, Lender may from time to time make Advances for payment of amounts that become due for nonconstruction expenses for which Borrower is responsible for payment, including, but not limited to, interest on the Loan. Such Advances may be made directly to parties to whom such amounts are due or to Lender to reimburse Lender for sums due to it. All such Advances to Persons other than Borrower shall be deemed Advances to Borrower hereunder and shall be included within the Obligations to the same extent as if they were made directly to Borrower.

2.4    <u>Representations and Warranties</u>. Each submission by Borrower to Lender of a Requisition shall constitute Borrower's representation and warranty to Lender that (i) all conditions

to the Advance set forth in this Loan Agreement are satisfied and (ii) the completed construction of the Improvements is in accordance with the Plans and Specifications and Legal Requirements.

2.5    <u>Lien Waivers and Title Updates</u>. Borrower shall submit with any Requisition lien waivers from General Contractor for the construction of the Improvements, together with an affidavit of General Contractor stating that all persons furnishing labor or materials for the construction of the Improvements have been paid in full (other than amounts owed to such persons that shall be paid from the Advance being requested). If the Title Company so requires, Borrower shall provide estoppel certificates, in form satisfactory to Lender and Title Company, showing amounts paid and due to all such persons. Prior to any Advance, Lender shall require an endorsement to the title policy delivered to Lender pursuant to Section 3.1.5 hereof that extends the effective date of such policy to the date of the Advance with no additional exceptions added to such policy.

2.6    <u>Frequency and Delivery of Advances</u>. Advances of the Loan shall be made at the main office of Lender in Birmingham, Alabama (or such other place as Lender may designate) and shall be made no more frequently that once per month. All Advances shall be disbursed to Borrower by depositing the same into the Loan Account. The Loan Account shall be used by Borrower only for the purpose of paying the costs and expenses contemplated by this Loan Agreement, and Borrower shall upon Lender's request provide Lender a list of all disbursements from the Loan Account, including all persons to whom disbursements are made and the amounts thereof to each.

2.7    <u>No Implied Approval of Construction</u>. The making of an Advance by Lender shall not constitute Lender's approval or acceptance of the construction of the Improvements theretofore completed. The inspection and approval by Lender or Lender's Consultant of the Plans and Specifications, the construction of the Improvements, or the workmanship and materials used therein shall impose no liability of any kind on Lender, the sole obligation of Lender as the result of such inspection and approval being to make the Advances if, and to the extent, required by this Loan Agreement. Lender has not undertaken and disclaims any duty or responsibility to inspect the construction progress or to monitor the proper application by General Contractor or others of funds disbursed pursuant hereto on behalf of Borrower, and Borrower acknowledges and agrees that it must satisfy itself as to the status of construction, the workmanship and materials used therein, and the application of moneys by General Contractor or others.

2.8    <u>No Waiver</u>. The provisions of this Article Two are solely for the benefit of Lender. Lender may, at its election, make one or more advances of the Loan to Borrower upon written or oral disbursement requests not complying with the requirements of this Article. All such advances shall, in the absence of bad faith by Lender, conclusively be deemed to be advances of the Loan to Borrower hereunder and shall be included within the Obligations to the same extent as if they were made in strict compliance with the requirements of this Article Two.

**ARTICLE THREE - CONDITIONS TO LENDING**

3.1    <u>Conditions Precedent to Initial Advance</u>.    The obligations of Lender under this Agreement, including, without limitation, the obligation of Lender to make the initial Advance to Borrower hereunder, are subject to the satisfaction of the following conditions precedent:

3.1.1    <u>Execution of Loan Documents</u>.    Execution, delivery, and, when appropriate, recording or filing of this Loan Agreement, the Note, the Security Documents, the Guaranty Agreement, and all other Loan Documents, all in form and content satisfactory to Lender;

3.1.2    <u>Payment of Fees and Expenses</u>.    Payment by Borrower of the Commitment Fee (as defined in the Commitment), which shall be deemed fully earned on receipt and shall not be subject to rebate or refund, in whole or in part, in the event that the Loan is prepaid voluntarily or involuntarily, and the payment or reimbursement by Borrower of all expenses incurred by or due to Lender with respect to the Loan, the Loan Documents, and the Property, including, but not limited to, tax service monitoring fees, fees and taxes on the Security Documents (including intangibles taxes and documentary stamp taxes), title insurance premiums, and fees and expenses of Lender's counsel and Lender's Consultant;

3.1.3    <u>Proceedings</u>.    Receipt by Lender of certified copies of the organizational documents for each Borrower Party who is not a natural Person, together with evidence that each such Borrower Party is qualified, registered, and in good standing in the state of its organization or formation and in the state where the Property is located (or evidence satisfactory to Lender and its counsel that such qualification and registration is not required under Legal Requirements), and certified resolutions of the governing body of each such Borrower Party authorizing the Loan, the execution and delivery of the Loan Documents, and the consummation or undertaking of all Obligations;

3.1.4    <u>Survey</u>.    Receipt by Lender of a current survey of the Land prepared by a registered land surveyor in accordance with Lender's standard survey memorandum and including the certification of the surveyor as to whether the Land or any portion thereof is within or without a special flood hazard area according to a FIA flood hazard boundary map issued by the Department of Housing and Urban Development Federal Insurance Administration, and following completion of the foundations of the Improvements, receipt by Lender of redated surveys with such additional matters included as Lender shall request;

3.1.5    <u>Title Insurance</u>.    Receipt by Lender of a paid title insurance policy issued by the Title Company in form and content acceptable to Lender, which insures that Lender holds a valid first lien and security interest in the Property pursuant to the Security Instrument, free and clear of all defects and encumbrances except the Permitted Encumbrances and such other matters as Lender might approve in its discretion, and containing (i) full coverage against liens of mechanics, materialman, laborers, and any other parties who might claim statutory or common law liens, (ii) no other "standard exceptions" to coverage, including survey exceptions, other than those approved by Lender, (iii) a "pending disbursement clause" in form and substance satisfactory to counsel for Lender, and (iv) any additional endorsements reasonably required by Lender;

11

3.1.6   <u>Lien Search</u>.   Receipt by Lender of a certification from the Title Company or an attorney acceptable to Lender (which shall be updated from time to time at Borrower's expense upon request by Lender) that a search of the public records disclosed no conditional sales contract, chattel mortgages, leases of personalty, financing statements, title retention agreements, tax liens, or judgment liens that affect the Collateral, except those in favor of Lender;

3.1.7   <u>Appraisal</u>.   Receipt by Lender of an appraisal of the Property prepared in conformity with the requirements of the Commitment, which appraisal indicates that the ratio of the principal amount of Loan to the appraised value of the Property does not exceed the Underwritten Loan To Value Ratio set forth in the Commitment;

3.1.8   <u>Environmental Assessment</u>.   Receipt by Lender of an environmental site assessment of the Land prepared in conformity with Lender's standard guidelines and otherwise acceptable to Lender in all respects;

3.1.9   <u>Insurance</u>.   Receipt by Lender of suitable policies of insurance against fire and other hazards in accordance with applicable requirements of this Loan Agreement, the Security Documents, and Legal Requirements;

3.1.10   <u>Access and Utilities</u>.   Receipt by Lender of evidence satisfactory to Lender as to (i) the methods of access to and egress from the Land and nearby or adjoining public ways, meeting the reasonable requirements of projects that are similar to the Property and the status of completion of any required improvements to such access, (ii) the availability of storm and sanitary sewer facilities meeting the reasonable requirements of the Property, and (iii) the availability of all other required utilities, in location and capacity sufficient to meet the reasonable needs of the Property;

3.1.11   <u>Legal Requirements</u>.   Receipt by Lender of evidence satisfactory to Lender as to (i) the securing of all requisite Permits relating to environmental matters, sanitary facilities, the Plans and Specifications, and any other matters that are subject to the jurisdiction of any Governmental Authority; and (ii) the compliance of the Improvements with Legal Requirements upon completion in accordance with the Plans and Specifications;

3.1.12   <u>Construction Contracts</u>.   Receipt by Lender of a certified copy of all Construction Contracts to which Borrower is a party as of the Closing Date, together with certificates executed by General Contractor, Design Architect, and Engineer, in form and content satisfactory to Lender, whereby such parties consent to Borrower's assignment of the Construction Contracts and the Plans and Specifications to Lender as additional security for the Obligations, subordinate any lien that any such Person might now or hereafter acquire against the Property or any part thereof to the security title and security interest of the Security Documents, and containing such further representations and covenants as Lender might request;

3.1.13   <u>Pre-Construction Review</u>.   Receipt and approval by Lender of a preconstruction review by the Lender's Consultant of the Plans and Specifications, the Construction Contracts, Permits, and other construction-related items, confirming to Lender for Lender's sole and exclusive benefit that in the opinion of the Lender's Consultant (i) the Plans and Specifications appear to comply with Legal Requirements, (ii) the amounts set forth in the Budget allocable to the construction of the Improvements

are reasonably sufficient to complete the Improvements, and all amounts budgeted for other purposes in the Budget appear reasonably sufficient, (iii) all Permits for construction and completion of the Improvements have been obtained (except for the building permit relating to the construction of the buildings comprising the Improvements), (iv) all Construction Contracts executed to date are in proper form, are sufficient to complete all material parts of the work in connection with the Improvements covered by such Construction Contracts in a timely manner prior to the Completion Deadline, and the amounts of all subcontracts executed to date are in the aggregate in line with the amounts contained in the Budget and the Schedule of Values for construction of the Improvements, and (v) such other construction issues as Lender might reasonably request;

3.1.14 <u>Lease Form and Management Agreement</u>. Receipt by Lender of (i) a certified copy of Borrower's standard lease form to be used with respect to the Property, and (ii) a copy of the Management Agreement, together with a subordination agreement, in form satisfactory to Lender, pursuant to which the Manager's rights under the Management Agreement are subordinated to the rights of Lender pursuant to the Loan Documents and addressing such other matters as Lender may request;

3.1.16 <u>Equity Contribution</u>. Receipt by Lender of evidence that the Equity Contribution has been made to the extent required as set forth in the Budget;

3.1.17 Omitted.

3.1.18 <u>Legal Opinions</u>. Receipt by Lender's counsel of an opinion of counsel for Borrower Parties in form and substance satisfactory to Lender's counsel; and

3.1.19 <u>Other Matters</u>. Such additional legal opinions, certificates, proceedings, instruments, and other documents required under the terms of the Commitment or as Lender or its counsel may reasonably request to evidence (i) compliance by Borrower with Legal Requirements, (ii) the truth and accuracy, as of the date of this Loan Agreement, of the representations and warranties of Borrower contained herein, and (iii) the due performance or satisfaction by Borrower, at or prior to the date hereof, of all agreements required to be performed and all conditions required to be satisfied by Borrower pursuant hereto.

3.2     <u>Conditions Precedent to Construction Advances</u>.  The obligation of Lender to make any Advance after the initial Advance hereunder is subject to the performance by Borrower of its Obligations to be performed hereunder at or prior to the disbursement of such Advance and to the satisfaction of the following conditions at the time of (and after giving effect to) the making of such Advance:

3.2.1     <u>No Default</u>. After giving effect to the Advance to be made, no Default or Event of Default has occurred or will occur as of the date of such Advance;

3.2.2     <u>Accuracy of Representations and Warranties</u>. All representations and warranties of Borrower contained in this Loan Agreement or in the other Loan Documents (other than those representations and warranties which are, by their terms, expressly limited to the date made or given) shall be true and correct in all material respects with the same effect as those such representations and warranties had been made on and as of the date of such Advance;

3.2.3   No Adverse Proceedings. No action or proceeding have been instituted or be pending before any court or other Governmental Authority or, to the knowledge of Borrower, threatened, which reasonably could be expected to have a Material Adverse Effect or the intended or actual use, occupancy, or operation of the Property;

3.2.4   No Violations. The Advance to be made and the use thereof shall not contravene, violate, or conflict with, or involve Lender in any violation of, any Legal Requirement; and

3.2.5   Status of Construction. The Improvements, in the reasonable judgment of Lender and Lender's Consultant, are capable of being completed in accordance with the Plans and Specifications on or before the Completion Deadline.

3.3   Conditions Precedent to Final Advance. The obligation of Lender to make the final Advance hereunder is subject to the performance by Borrower of its Obligations to be performed hereunder at or prior to the disbursement of such Advance and to the satisfaction of the following conditions at the time of (and after giving effect to) the making of such Advance:

3.3.1   Certificate of Substantial Completion. A certificate from the Design Architect and a notice from the Lender's Consultant that both state that the construction of the Improvements has been substantially completed in a good and workmanlike manner and in accordance with the Plans and Specifications (including, without limitation, the furnishing and fixturing of the Improvements and all clearing, landscaping, lighting, and paving of the Land) and in compliance with Legal Requirements, and addressing such other details concerning construction of the Improvements as Lender shall request;

3.3.2   As-Built Survey. A current as-built survey showing the location of all the Improvements prepared in accordance with Lender's standard guidelines, which includes the certification of the surveyor that the Improvements have been constructed within the established building and property lines and in compliance with any restrictions of records or ordinances relating to the location thereof;

3.3.3   Required Approvals. Unconditional, final certificates of occupancy for the Improvements, any required approval by the Board of Fire Underwriters or its equivalent acting in and for the locality in which the Property is situated, and any other approval required by the appropriate Governmental Authority to the extent that any such approval is a condition to the lawful use and occupancy of the Improvements and opening the same to the public;

3.3.4   Lien Waivers. A duly sworn and executed affidavit from General Contractor, in form and substance acceptable to Lender and to Title Company, stating that all amounts due to contractors, subcontractors, laborers, materialmen, and all others supplying labor or materials to or performing work on the Improvements have been paid in full (or upon the making of such Advance shall be paid in full) and which affidavit shall be legally sufficient to dissolve all statutory and common law, existing and inchoate liens and claims of liens against the Property;

3.3.5   Title Endorsement. An endorsement to Lender's title policy or other evidence satisfactory to Lender that there has been no change in the status of the title to the Property, creation of any new encumbrance thereon, or occurrence of any event that

could in Lender's opinion impair the priority of the lien and security interest of the Security Instrument;

3.3.6    Insurance. Policies of insurance providing fire and extended coverage and business income interruption coverage in accordance with applicable requirements of this Loan Agreement, the Security Documents, and Legal Requirements;

3.3.7    Other Items. Such other items, instruments, documents, and certificates as Lender or the Lender's Consultant might reasonably request with respect to the completion of the Improvements and the performance of the Obligations.

3.4    No Waiver. If Lender, at its option, elects to make one or more Advances prior to receipt and approval of all items required by this Article Three, such election shall not obligate Lender to make any subsequent Advance requested by Borrower. The closing of the Loan and execution of this Loan Agreement shall not be construed as approval by Lender of items submitted prior to closing or as a waiver of the right to require other items required by this Loan Agreement or corrections or additional items that might be necessary to Lender upon Lender's review of any items received after closing.

## ARTICLE FOUR - REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties Regarding Borrower Parties. Borrower represents and warrants to Lender that:

4.1.1    Due Organization and Qualification. Each of the Borrower Parties is duly organized, validly existing, and in good standing under the laws of the state of its formation as set forth in the heading of this Loan Agreement and is qualified to transact business and is in good standing in the state in which the Land is located and in each other jurisdiction where the failure to be so qualified and to be in good standing would adversely affect the conduct of its business or the validity of, the enforceability of, or the ability of any Borrower Party to perform, the Obligations under this Loan Agreement and the other Loan Documents.

4.1.2    Power and Authority. Each of the Borrower Parties has the requisite power and authority to (i) to own its properties and to carry on its business as now conducted and as contemplated to be conducted in connection with the performance of the Obligations hereunder and under the other Loan Documents and (ii) to execute and deliver this Loan Agreement and the other Loan Documents, to incur and perform the Obligations and to carry out the transactions contemplated by this Loan Agreement and the other Loan Documents,

4.1.3    Due Authorization. The execution, delivery, and performance of this Loan Agreement and the other Loan Documents have been duly authorized by all necessary action and proceedings by or on behalf of each of the Borrower Parties, and no further approvals or filings of any kind, including any approval of or filing with any Governmental Authority, are required by or on behalf of each of any Borrower Party as a condition to the valid execution, delivery, and performance by such Borrower Party of this Loan Agreement and the other Loan Documents.

4.1.4    Enforceability.    This Loan Agreement and each of the other Loan Documents have been duly authorized, executed, and delivered by each of the Borrower Parties and constitute the legal, valid, and binding obligation of such Borrower Party, enforceable against such Borrower in accordance with their respective terms, except as such enforceability may be affected by applicable conservatorship, bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally.  This Loan Agreement and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim, or defense by any Borrower Party, including the defense of usury, and no Borrower Party has asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

4.1.5    No Conflicts.    Neither the execution and delivery of this Loan Agreement and the other Loan Documents, nor the fulfillment of or compliance with the terms and conditions of this Loan Agreement and the other Loan Documents, nor the performance of the Obligations (i) conflicts with or result in (or will conflict with or result in) any breach or violation of any Legal Requirement enacted or issued by any Governmental Authority or other agency having jurisdiction over Borrower or any portion of the Collateral, or any judgment or order applicable to Borrower, or to which Borrower or any portion of the Collateral is subject; (ii) conflicts with or result in (or will conflict with or result in) any material breach or violation of, or constitute a default under, any of the terms, conditions, or provisions of Borrower's organizational documents, any indenture, existing agreement, or other instrument to which Borrower is a party, or to which Borrower or any portion of the Collateral is subject; (iii) results in or requires (or will result in or require) the creation of any lien on all or any portion of the Collateral, except for the Permitted Encumbrances; or (iv) requires (or will require) the consent or approval of any creditor of Borrower, any Governmental Authority, or any other Person except such consents or approvals that have already been obtained.

4.1.6    Pending Litigation or other Proceedings.    There is no pending or, to the best knowledge of any Borrower Party, threatened action, suit, proceeding, or investigation, at law or in equity, before any court, board, body, or official of any Governmental Authority or arbitrator against or affecting the Property or any other portion of the Collateral or other assets of Borrower, which, if decided adversely to Borrower, would have, or may reasonably be expected to have, a Material Adverse Effect.  No Borrower Party is in default with respect to any order of any Governmental Authority.

4.1.7    Solvency.    Borrower is not insolvent and will not be rendered insolvent by the transactions contemplated by this Loan Agreement or the other Loan Documents, and after giving effect to such transactions, Borrower will not be left with an unreasonably small amount of capital with which to engage in its business or undertakings, nor will Borrower have incurred, have intended to incur, or believe that it has incurred, debts beyond its ability to pay such debts as they mature.  Borrower did not receive less than a reasonably equivalent value in exchange for incurrence of the Obligations.  There (i) is no contemplated, pending or, to the best of Borrower's knowledge, threatened bankruptcy, reorganization, receivership, insolvency, or like proceeding, whether voluntary or involuntary, affecting any Borrower Party or the Property and (ii) has been no assertion or exercise of jurisdiction over any Borrower Party or the Property by any court empowered to exercise bankruptcy powers.

4.1.8    No Contractual Defaults.  There are no defaults by Borrower or, to the knowledge of Borrower, by any other Person under any contract to which Borrower is a party relating to the Property, including any management, rental, service, supply, security, maintenance, or similar contract, other than defaults which do not permit the non-defaulting party to terminate the contract and which do not have, and are not reasonably be expected to have, a Material Adverse Effect.  Neither Borrower nor, to the knowledge of Borrower, any other Person, has received notice or has any knowledge of any existing circumstances in respect of which it could receive any notice of default or breach in respect of any contracts affecting or concerning any Property.

4.1.9    Compliance with the Loan Documents.  Borrower is in compliance with all provisions of the Loan Documents to which it is a party or by which it is bound.  The representations and warranties made by Borrower in the Loan Documents are true, complete and correct and do not contain any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

4.1.10    Non-Foreign Person.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

4.1.11    ERISA.  Neither Borrower nor any member of the "controlled group" of Borrower has established and is a party to an "employee benefit plan" within the meaning of Section 3(3) of Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), or any other option or deferred compensation plan or contract for the benefit of its employees or officers, pension, profit sharing or retirement plan, redemption agreement, or any other agreement or arrangement with any officer, director or owner, members of their families, or trusts for their benefit, and the assets of Borrower do not and shall not constitute "plan assets" of one more such plans for purposes of ERISA.

4.1.12    Ownership.  The ownership of all interests in Borrower have been accurately disclosed to Lender in writing.  There are no outstanding warrants, options, or rights to purchase any ownership interests of Borrower, nor does any Person have a Lien upon any of the ownership interests of Borrower.

4.1.13    Investment Company Act.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended, (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended, or (iii) subject to any other federal or state law or regulation that purports to restrict or regulate its ability to borrow money.

4.1.14    Financial Information.  The financial projections relating to each Borrower Party and delivered to the Lender on or prior to the date hereof, if any, were prepared on the basis of assumptions believed by such Borrower Party, in good faith at the time of preparation, to be reasonable, and no Borrower Party is aware of any fact or information that would lead it to believe that such assumptions are incorrect or misleading in any material respect; provided, however, that no representation or warranty is made that any result set forth in such financial projections shall be achieved.  The

financial statements of Borrower and any rent rolls for the Property which have been furnished to Lender are complete and accurate in all material respects and present fairly the financial condition of Borrower and the leasing status of the Property, and there are no liabilities, direct or indirect, fixed or contingent, as of the respective dates of such financial statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements. The financial statements of Borrower have been prepared in accordance with GAAP. Since the date of the most recent of such financial statements, no event has occurred which would have, or may reasonably be expected to have, a Material Adverse Effect, and there has not been any material transaction entered into by Borrower other than transactions in the ordinary course of business. Borrower has filed all federal, state, and local tax returns that are required to be filed and has paid, or made adequate provision for the payment of, all taxes that have or may become due pursuant to such returns or to assessments received by Borrower.

4.1.15  Accuracy of Information. No information, statement, or report furnished in writing to Lender by any Borrower Party in connection with this Loan Agreement or any other Loan Document, or in connection with the consummation of the transactions contemplated hereby and thereby, contains any material misstatement of fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

4.1.16  No Conflicts of Interest. To the best knowledge of Borrower, no officer, agent, or employee of Lender has been or is in any manner interested, directly or indirectly, in that Person's own name, or in the name of any other Person, in the Loan Documents, Borrower, or the Property, in any contract for property or materials to be furnished or used in connection with the Property, or in any aspect of the transactions contemplated by the Loan Documents.

4.1.17  No Reliance. Borrower acknowledges, represents, and warrants that it understands the nature and structure of the transactions contemplated by this Loan Agreement and the other Loan Documents, that it is familiar with the provisions of all of the documents and instruments relating to such transactions, that it understands the risks inherent in such transactions, including the risk of loss of the Collateral or a part thereof, and that it has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by this Loan Agreement or any other Loan Document or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with this Loan Agreement, any other Loan Document, or any of the matters contemplated hereby or thereby.

4.1.18  Contracts with Affiliates. Except as otherwise approved in writing by Lender (and Lender has approved Borrower's contract with the General Contractor for construction of the Improvements), Borrower has not entered into and is not a party to any contract, lease, or other agreement with any Affiliate of Borrower for the provision of any service, materials, or supplies to the Property (including any contract, lease, or agreement for the provision of property management services, cable television services or equipment, gas, electric or other utilities, security services or equipment, laundry services or equipment or telephone services or equipment).

4.1.19  Lines of Business. Borrower is not engaged in any businesses other than the acquisition, ownership, development, construction, leasing, financing, or management

of multifamily residential properties, and the conduct of these businesses does not violate the organizational documents pursuant to which it is formed.

4.1.20   Status as a Limited Partnership. Borrower is qualified, and is taxed as, a partnership under Subchapter K of the Internal Revenue Code, and is not engaged in any activities which would jeopardize such qualification and tax treatment.

4.2    Representations and Warranties Regarding the Property. Borrower represents and warrants to Lender with respect to the Property that:

4.2.1   Title. Borrower has good, valid, marketable, and indefeasible title to the Property, free and clear of all liens whatsoever except the Permitted Encumbrances. The Security Instrument, if and when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create a valid, perfected first lien on the Collateral intended to be encumbered thereby (including the Leases and the rents and all rights to collect rents under such Leases), subject only to Permitted Encumbrances. Except for any Permitted Encumbrances, there are no liens or claims for work, labor, or materials affecting the Property that are or may be prior to, subordinate to, or of equal priority with, the liens created by the Loan Documents. The Permitted Encumbrances do not have, and may not reasonably be expected to have, a Material Adverse Effect.

4.2.2   Impositions. Borrower has filed all property and similar tax returns required to have been filed by it with respect to the Property and has paid and discharged, or caused to be paid and discharged, all installments for the payment of all taxes due to date, and all other material Impositions imposed against, affecting, or relating to the Property other than those which have not become due, together with any fine, penalty, interest, or cost for nonpayment pursuant to such returns or pursuant to any assessment received by it. Borrower has no knowledge of any new proposed tax, levy, or other governmental or private assessment or charge in respect of the Property which has not been disclosed in writing to Lender.

4.2.3   Legal Requirements. The Property complies in all material respects with all Legal Requirements. Without limiting the foregoing, all Permits and any other necessary consents and approvals of any Governmental Authority that are necessary under Legal Requirements to permit the construction of the Improvements according to the Plans and Specifications have been issued and are in full force and effect. The Improvements, when completed according to the Plans and Specifications, shall comply with Legal Requirements. Neither Borrower nor, to the knowledge of Borrower, any former owner of the Property, has received any written notification or threat of any actions or proceedings regarding the noncompliance or nonconformity of the Property with any Legal Requirements, nor is Borrower otherwise aware of any such pending actions or proceedings.

4.2.4   Leases. No Leases are in effect with respect to the Property as of the Closing Date. Borrower has delivered to Lender a true and correct copy of its form of apartment lease for the Property.

4.2.5   Insurance. Borrower has delivered to Lender true and correct certified copies of all insurance policies currently in effect as of the date of this Loan Agreement

with respect to the Property. Each such insurance policy complies in all material respects with the requirements set forth in the Loan Documents.

4.2.6    Tax Parcels. The Property is on one or more separate tax parcels, and each such parcel (or parcels) is (or are) separate and apart from any other property.

4.2.7    Encroachments. Except as disclosed on the survey delivered to Lender with respect to the Property, none of the Improvements encroaches upon the property of any other Person or upon any easement encumbering the Property nor lies outside of the boundaries and building restriction lines of the Property, and no improvement located on property adjoining the Property lies within the boundaries of or in any way encroaches upon the Property.

4.2.8    Independent Unit. Except for Permitted Encumbrances or as disclosed in the title insurance policy or survey for the Property delivered to Lender, the Property is an independent unit that does not rely on any drainage, sewer, access, parking, structural, or other facilities located on any property not included in either the Property or on public or utility easements for the (i) fulfillment of any zoning, building code, or other requirement of any Governmental Authority that has jurisdiction over the Property, (ii) structural support, or (iii) the fulfillment of the requirements of any Lease or other agreement affecting the Property. Borrower, directly or indirectly, has the right to use all amenities, easements, public or private utilities, parking, access routes, or other items necessary or currently used for the operation of the Property. All public utility and sanitary sewage services necessary for the construction and use of the Improvements are available to the Land, and Borrower has received permission to make such use thereof as is necessary for construction and to make permanent connections thereto upon completion. The Property is either (x) contiguous to or (y) benefits from an irrevocable unsubordinated easement permitting access from the Property to a physically open, dedicated public street, and has all necessary permits for ingress and egress and is adequately serviced by public water, sewer systems, and utilities. No building or other improvement not located on the Property relies on any part of the Property to fulfill any zoning requirements, building code, or other requirement of any Governmental Authority that has jurisdiction over the Property for structural support or to furnish to such building or improvement any essential building systems or utilities.

4.2.9    Construction Contracts. Borrower has delivered to Lender a true, correct, and complete copy of each Construction Contract to which Borrower is a party thereto, and no other contractors, architects, or engineers have been retained by Borrower in connection with the design or construction of the Improvements. The Construction Contracts are in full force and effect and no defaults have occurred thereunder.

4.2.10    Management Agreement. The Management Agreement is in full force and effect, has not been modified, altered, or amended except as disclosed to Lender in writing, and constitutes the complete agreement among the parties named therein with respect to the subject matter thereof. Except as set forth in the Management Agreement, neither Manager nor any other Person has any right or claim to any fees, commissions, compensation, or other remuneration in connection with or arising out of the use, occupancy, and operation of the Property.

4.2.11    Authority of Authorized Representative. The Authorized Representative has authority, acting alone, to prepare and submit Requisitions and to collect or otherwise

deal with any disbursement of Loan proceeds. Lender may rely solely upon all certifications and representations made by the Authorized Representative with respect to any Requisition. The authority of an Authorized Representative may be revoked only by a writing executed by Borrower and delivered to an officer of Lender. Lender shall not be liable for any disbursements made in good faith and at the request of the Authorized Representative or for any disbursement made prior to the actual receipt of notice from Borrower that the authority of the Authorized Representative has been revoked.

4.3   Continuing Effectiveness. Borrower acknowledges and agrees that Lender has materially relied upon the representations and warranties set forth in this Article.   All representations and warranties contained herein shall continue in effect at all times while any Obligations remain outstanding and shall be incorporated by reference in each Requisition submitted by Borrower, unless Borrower specifically notifies Lender of any change therein.

## ARTICLE FIVE - COVENANTS

5.1   Covenants Pertaining To Borrower Generally. Borrower covenants and agrees that, from the date of this Loan Agreement and so long as the Obligations remain outstanding, Borrower shall comply with, perform, and observe at all times the following covenants:

5.1.1   Maintain Existence. Borrower shall maintain its existence as a limited partnership in good standing under the laws of the state of its formation. Borrower Party shall continue to be duly qualified to do business in each jurisdiction in which such qualification is necessary to the conduct of its business and where the failure to be so qualified would adversely affect the validity of, the enforceability of, or the ability to perform, its obligations under this Loan Agreement or any other Loan Document and its qualification to conduct business in the state in which the Property is located. Borrower shall permit no amendment or modification of, in any material respect, the organizational documents of Borrower without obtaining the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed. Borrower shall not dissolve or liquidate in whole or in part, or merge or consolidate with any Person. Borrower shall not change the location of its chief executive office without first giving Lender at least thirty (30) days prior written notice thereof and promptly providing Lender such information as Lender may request in connection therewith.

5.1.2   Operation and Separateness. Borrower shall (i) engage in no business or activity other than the ownership, management, and operation of the Property or other multifamily residential properties, (ii) enter into no contract or agreement with any Affiliate except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than such Affiliate, (iii) make no loan or advance to any Person (including any Affiliate) and acquire no obligations or securities of an Affiliate, (iv) hold itself out to the public as a legal entity separate and distinct from any other Person (including any Affiliate), (v) conduct business in its own name and shall maintain and utilize separate stationery, invoices and checks, (vi) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, (vii) maintain its assets in such a manner that it shall not be costly or difficult to segregate, ascertain, or identify its individual assets from those of any Affiliate or any other Person.

5.1.3   Books and Records.   Borrower shall keep and maintain at all times complete and accurate books of accounts and records in sufficient detail to correctly reflect (i) all of Borrower's financial transactions and assets, (ii) the construction of the Improvements, and (iii) the results of the operation of the Property, which books and records shall reflect the consistent application of accepted accounting methods, and copies of all written contracts, Leases and other instruments which affect the Property (including all bills, invoices and contracts for electrical service, gas service, water and sewer service, waste management service, telephone service and management services). Borrower shall make such books and records available at reasonable times for inspection and copying by Lender or its agent. Borrower shall not change its methods of accounting without the prior written consent of Lender.

5.1.4   Reports and Notices.   Borrower shall furnish promptly to Lender such information as Lender requests concerning costs, progress of construction, marketing, and such other factors as Lender requires. Borrower shall promptly inform Lender in writing of any of the following (and shall deliver to the Lender copies of any related written communications, complaints, orders, judgments and other documents relating to the following) of which Borrower has actual knowledge:   (a) The occurrence of any Default or Event of Default under this Loan Agreement or any other Loan Document; (b) the commencement or threat of, or amendment to, any proceedings by or against Borrower in any federal, state, or local court or before any Governmental Authority, or before any arbitrator, which, if adversely determined, would have, or at the time of determination may reasonably be expected to have, a Material Adverse Effect; (c) the commencement or threat of any condemnation or similar proceedings with respect to the Property or of any proceeding seeking to enjoin the intended use of the Improvements or any portion thereof; (d) the occurrence of any material change in Legal Requirements; (e) the commencement of any proceedings by or against Borrower under any applicable bankruptcy, reorganization, liquidation, insolvency, or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, trustee, or other similar official is sought to be appointed for it; (f) the receipt of notice from any Governmental Authority having jurisdiction over Borrower that (i) Borrower is being placed under regulatory supervision, (ii) any license, Permit, charter, membership, or registration material to the conduct of Borrower's business or the Property is to be suspended or revoked, or (iii) Borrower is to cease and desist any practice, procedure, or policy employed by Borrower, as the case may be, in the conduct of its business, and such cessation would have, or may reasonably be expected to have, a Material Adverse Effect; and (g) the occurrence of any act, omission, change, or event which has a Material Adverse Effect.

5.1.5   Future Financial and Operating Statements.   Borrower shall furnish or cause to be furnish to Lender within the time periods specified, the following financial reports and information:

> (i)      As soon as available, but in no event later that ninety (90) days after the end of each fiscal year of Borrower, unaudited financial statements of Borrower for the year just ended, prepared in accordance with GAAP, and including a balance sheet and Operating Statement, and changes in financial position;

> (ii)      As soon as available, but in no event later than forty-five (45) days after the end of each fiscal quarter, an unaudited balance sheet

and Operating Statement for such quarter and year to date, comparison with the same quarter and year to date in the prior fiscal year.

(iii)    As soon as available, but no later than forty-five (45) days of the end of each fiscal quarter, a current Rent Roll; and

(iv)    Such additional financial information (including tax returns, detailed cash flow information, and contingent liability information) of Borrower at such times as Lender shall deem necessary.

Notwithstanding anything herein to the contrary, following completion of the Improvements and until occupancy of the apartment units at the Property (pursuant to signed Leases) has reached 85%, and such occupancy has been maintained for a period of at least six (6) consecutive months, the financial statements (including Rent Roll) to be furnished under subparagraphs (ii) and (iii) above shall be delivered to Lender on a monthly basis (as soon as available but not less than 15 days after the end of each calendar month).

All financial statements, Operating Statements, and Rent Rolls shall be certified to be correct by the chief financial officer or equivalent of Borrower. If required by Lender following the occurrence of an Event of Default, all annual financial statements shall also be audited statements certified by a certified public accountant acceptable to Lender. Borrower shall certify with delivery of each of its financial statements that (x) Borrower has complied with and is in compliance with all terms, covenants and conditions of this Loan Agreement, (y) no Default or Event of Default exists or, if such is not the case, that one or more specified Defaults or Events of Default have occurred, and (z) the representations and warranties contained in this Loan Agreement are true with the same effect as though made on the date of such certificate. If any such financial statements are not timely delivered to Lender, which failure is not cured within thirty (30) days after Lender gives written notice thereof to Borrower, Lender may, at its option, assess a late fee in the amount of $1,500 for each thirty-day period that passes after the expiration of such cure period.

5.1.6   Security Deposit Information.   Upon the Lender's request, Borrower shall furnish an accounting of all security deposits held in connection with any Lease of any part of the Property, including the name and identification number of the accounts in which such security deposits are held, the name and address of the financial institutions in which such security deposits are held and the name and telephone number of the person to contact at such financial institution, along with any authority or release necessary for the Lender to access information regarding such accounts.

5.1.7   Changes in Accounting.   Borrower shall not change its methods of accounting, unless such change is permitted by GAAP, and provided such change does not have the effect of curing or preventing what would otherwise be a Default or an Event of Default had such change not taken place.

5.1.8   Taxes and Insurance.   Borrower shall pay promptly when due and before the accrual of penalties thereon all taxes, including all real and personal property taxes and assessments levied or assessed against Borrower or the Property (or any portion thereof), and provide Lender with receipted bills therefor if requested by Lender.

Borrower shall acquire and maintain in effect all insurance policies required by the Security Documents and Legal Requirements.

    5.1.9   ERISA. Borrower shall engage in no transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under this Loan Agreement or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the ERISA. Borrower shall deliver to Lender such certifications or other evidence from time to time, as requested by Lender in its sole discretion, that the representations and warranties of Borrower contained in Article Four above are true and correct.

5.2    Covenants Relating to Property. Borrower further covenants and agrees that, from the date of this Loan Agreement and so long as the Obligations remain outstanding, Borrower shall comply with, perform, and observe at all times the following covenants:

    5.2.1   Construct Improvements. Borrower shall commence the construction of the Improvements, if such construction has not already begun, on or before the date that is thirty (30) days from the date of this Loan Agreement. Borrower shall cause the Improvements to be constructed on the Land in accordance with the Plans and Specifications and in compliance with Legal Requirements. Borrower shall cause such construction to proceed continuously in accordance with the Construction Contracts and to substantially complete construction of the Improvements by the Completion Deadline, time being of the essence. Borrower shall furnish to Lender within thirty (30) days of Lender's request a foundation survey and an as-built survey, each in form satisfactory to Lender, showing the extent of construction of the Improvements without violation of Legal Requirements and showing no encroachments or other conditions that could adversely affect the value and utility of the Property. Borrower shall promptly notify Lender in writing of any material changes in utility availability and anticipated costs of completion of the Improvements.

    5.2.2   Use of Proceeds. Borrower shall use the proceeds of the Loan solely and exclusively for the purposes set forth in, and in the amounts set forth in, the Budget and shall pay all fees, closing costs, and other nonconstruction expenses relating to the Loan, the construction of the Improvements, or the discharge of Borrower's obligations under this Loan Agreement, the Lease, and Legal Requirements as Lender has approved or may from time to time approve.

    5.2.3   Deficiencies. In the event that Lender reasonably determines that the amount necessary to fully complete the construction of the Improvements free of all liens, including direct and indirect costs and work performed but for which payment has not been made, and to pay all nonconstruction costs associated with the Property and the Loan, including interest accrued and to accrue on the Loan and any other sums due pursuant to the terms of this Loan Agreement, exceeds the undisbursed proceeds of the Loan, then within ten (10) days of Lender's demand therefor, Borrower shall deposit cash with Lender in the amount of such excess, which cash deposit shall be disbursed by Lender to paid costs set forth in the Budget prior to next Advance. If Borrower disputes Lender's determination of the amount necessary to so complete construction of the Improvements and to so pay such nonconstruction costs, the determination of Lender's Consultant of said amount shall control.

5.2.4    Changes to Plans and Specifications.  Borrower shall not authorize or permit any change to the Plans and Specifications without the prior written consent of Lender and any Governmental Authority having jurisdiction or any other Person to the extent such approval is required by Legal Requirements, provided that Lender's consent shall not be required with respect to a Permitted Change Order (but Borrower shall provide written notice to Lender of any such Permitted Change Order).

5.2.5    Construction Contracts.  Borrower shall not enter into any Construction Contract without the prior written consent of Lender, which consent shall not be unreasonably withheld.  Borrower shall (i) duly perform, observe, and comply with all obligations on Borrower's part contained in the Construction Contracts, (ii) enforce and protect the rights and remedies of Borrower pursuant to the Construction Contracts, (iii) agree to or permit no material amendment, modification, termination, or cancellation of any Construction Agreement without the prior written consent of Lender (including any change in General Contractor, the Design Architect, or the Engineer), provided that Lender's consent shall not be required with respect to a Permitted Change Order (but Borrower shall provide written notice to Lender of any such Permitted Change Order). Upon Lender's written request, Borrower shall notify Lender promptly of the names and addresses of all contractors, subcontractors, and materialmen who are employed in connection with the construction of the Improvements but whose names and addresses were not heretofore supplied to Lender. Borrower shall notify Lender of the occurrence of any material dispute, event of default, or repudiation by any party under the Construction Contracts.

5.2.6    Inspection Rights and Promotion.  Borrower shall permit, and require Manager to permit, Persons designated by Lender to visit and inspect the Property, to examine and make excerpts from the books and records of Borrower and Manager, and to discuss the business affairs, finances, and accounts of Borrower, Manager, and the Property with representatives of Borrower and Manager, as designated by Lender, all in such detail and at such times as Lender may reasonably request.  During the course of construction of the Improvements, Borrower shall erect and maintain, at Borrower's expense, a sign on the Land in size and content reasonable acceptable to Lender that identifies Lender as construction lender for the Property and otherwise name Lender as construction lender in Borrower's publicity and promotion relating to the Property.

5.2.7    Zoning Changes.  Borrower shall not initiate or consent to any zoning reclassification of the Property or seek any variance under any zoning ordinance or use or permit the use of the Property in any manner that could result in the use becoming a nonconforming use under any zoning ordinance or any other applicable land use law, rule, or regulation.

5.2.8    Legal Requirements.    Borrower shall comply with all Legal Requirements in all respects.  Borrower shall procure and continuously maintain in full force and effect, and shall abide by and satisfy all material terms and conditions of, all Permits.  Without limiting the generality of the foregoing covenant, Borrower specifically agrees that the Property shall at all times strictly comply, to the extent applicable, with the requirements of the Fair Housing Amendments Act of 1988, the Americans with Disabilities Act of 1990, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "Access Laws").  Notwithstanding any provisions set forth

herein or in any other document regarding Lender's approval of alterations of the Property, Borrower shall not alter or permit the Property to be altered in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Lender. Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

5.2.9   Appraisals.  Borrower shall permit Lender and its agents, employees, or independent contractors, at any time (but not more often than once in any calendar year so long as no Event of Default has occurred), while the Obligations remain outstanding, to enter upon and appraise the Property, and Borrower shall cooperate with and provide any information requested in connection with such appraisal. Borrower shall pay the costs of any such appraisal (i) if an Event of Default has occurred and is continuing or (ii) if such appraisal is required by external regulatory authorities having jurisdiction over Lender.

5.2.10   Conduct of Business.  Following completion of the Improvements, Borrower shall cause the operation of the Property to be conducted at all times in a manner consistent with the level of operation of the Property as of the date hereof. Without limiting the foregoing, Borrower shall (i) operate the Property in a prudent manner in compliance with Legal Requirements, (ii) maintain sufficient equipment and supplies of types and quantities at the Property to enable Borrower or Manager adequately to perform the operation of the Property and Borrower's obligations under the Leases, and (iii) keep all Improvements in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto to keep the same in good condition.

5.2.11   Leases.  Borrower shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases or any guaranty of any Lease as a security for the Obligations. Borrower shall, in the ordinary course of its business, enforce all of the terms, covenants, and conditions contained in the Leases upon the part of the Tenants thereunder to be observed or performed. Except as otherwise consented to by Lender, all Leases shall be written on the standard form of lease which shall have been approved by Lender. Borrower shall hold, or cause Manager to hold, all security deposits with respect to Leases in a segregated account and otherwise in conformity with Legal Requirements.

5.2.12   Management Agreement.  Borrower shall maintain the Management Agreement in full force and effect and duly observe, perform, and comply with all of Borrower's obligations thereunder and enforce performance of all obligations of Manager thereunder. Borrower shall promptly notify Lender of any dispute, default, event of default, or repudiation by Manager under the Management Agreement. Borrower shall not enter into any management agreement for the Property other than the Management Agreement, unless Borrower first notifies Lender and provides Lender a copy of the proposed management agreement, obtains Lender's written consent thereto and obtains and provides Lender with a subordination agreement in form satisfactory to Lender from such manager subordinating to all rights of Lender. Borrower shall not enter into,

terminate, amend, modify, or extend the Management Agreement, or consent to any such action on the part of Manager, without the prior written consent of Lender, which consent may be withheld or granted in Lender's sole discretion.

5.2.13  Ownership of Personalty.  Borrower shall furnish to Lender, if Lender so requests, the contracts, bills of sale, receipted vouchers, and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures, and other personal property used or to be used in the construction or operation of the Improvements.

5.2.14  Comply with Other Loan Documents.  Borrower shall perform all its obligations under the Note, the Security Documents, and all other Loan Documents.

5.2.15  Other Acts.  At Lender's request, Borrower shall execute and deliver to Lender all further documents and perform all other acts that Lender reasonably deems necessary or appropriate to perfect or protect its security for the Obligations.

## ARTICLE SIX - PROHIBITION ON TRANSFERS OF COLLATERAL

6.1    General Prohibition.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and the owners of the beneficial interest in Borrower and Borrower's constituent entities in owning and operating properties such as the Property in agreeing to make the Loan, and that Lender will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Obligations, Lender can recover all or a portion of the Obligations by a sale of the Property. Except as expressly provided herein, Lender may, at Lender's option, declare all the Obligations immediately due and payable, and Lender may invoke any rights and remedies permitted by this Loan Agreement and the other Loan Documents, in the event that Borrower, without the prior written consent of Lender, which consent may not be unreasonably withheld by Lender after consideration of all relevant factors, sells, conveys, alienates, mortgages, encumbers, pledges, or otherwise transfers the Collateral or any part thereof or any interest therein, or permits the Collateral or any part thereof or any interest therein to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred (collectively, a "**Transfer**").

6.2    Transaction Included.  A Transfer within the meaning of Section 6.1 shall be deemed to include, without limitation, (i) an installment sales agreement wherein Borrower agrees to sell the Collateral or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space lessee thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to the Leases or any rents therefrom; (iii) any divestiture of Borrower's title to the Collateral or any interest therein in any manner or way, whether voluntary or involuntary, or any merger, consolidation, dissolution or syndication affecting Borrower; (iv) if Borrower or any general partner of Borrower is a corporation, the voluntary or involuntary sale, conveyance, or transfer of any of such corporation's stock or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than ten percent (10%) of such corporation's stock shall be vested in

a Person or Persons who are not now stockholders of such corporation, or any change in the control of such corporation directly or indirectly; (v) if Borrower or any general partner of Borrower is a limited or general partnership, joint venture, or limited liability company, the change, removal, resignation, or addition of a general partner, managing partner, limited partner, joint venturer, manager, or member, or the transfer of any partnership interest of any general partner, managing partner, or limited partner, or the transfer of any interest of any joint venturer or member (or the transfer of any interest of any Person directly or indirectly controlling such partner, joint venturer, or member by operation of law or otherwise); and (vi) if Borrower or any general partner of Borrower is a business trust, the change, removal, resignation, or addition of a trustee, or the voluntary or involuntary sale, conveyance, or transfer of any beneficial interest.

6.3    Permitted Transfers.  Notwithstanding the provisions of Section 6.1 above, the following Transfers are permitted without the consent of Lender:

(a)    The sale, assignment, conveyance or transfer of an ownership interest in Borrower or any general partner, manager, or member of Borrower if such transfer, together with all prior transfers of ownership interests in such entity since the date of this Loan Agreement, relates to twenty-five percent (25%) or less of the beneficial ownership interest in such entity and so long as those Persons responsible for the management of the Property remain unchanged as a result of such transfers or any replacement management is approved by Lender;

(b)    Any involuntary transfer caused by the death of Borrower or any member, general partner, shareholder, joint venturer, or beneficial owner of any person holding any interest in Borrower, any beneficial owner of Borrower or any trustee of Borrower, or if Borrower is a partnership, any limited partner thereof, or if Borrower is a limited liability company, any member, so long as Borrower is reconstituted, if required, following such death and so long as those Persons responsible for the management of the Property remain unchanged as a result of such death or any replacement management is approved by Lender;

(c)    The execution of a new Lease or the renewal of an existing Lease, provided that (i) the renewal or the proposed Lease has a term of not less than six (6) months and not more than two (2) years, (ii) the rental income pursuant to the renewal or proposed Lease is not more than five percent (5%) of the total rental income for the Improvements, (iii) the renewal or proposed Lease does not exceed five percent (5%) of the leaseable space in the Improvements, (iv) the renewal or proposed Lease is executed on Borrower's standard Lease form that has first been submitted to and approved by Lender, (v) the renewal or proposed Lease does not contain an option to purchase the Property or any part thereof, and (v) the renewal or proposed Lease requires the payment of fixed rent at a current local fair-market rate, (vi) no rent credits, free rents, or concessions have been granted under the renewal or proposed Lease, and (vii) the Tenant under the renewal or proposed Lease is a bona fide party who is not an Affiliate.

(d)    A sale or other disposition of obsolete or worn out personal property, provided that such personal property is contemporaneously replaced by comparable personal property of equal or greater value that is free and clear of Liens other than the Permitted Encumbrances.

(e)     Any Transfer that constitutes a Permitted Encumbrance at the time such Transfer occurs.

(f)     The grant of an easement, if prior to the granting of the easement Borrower causes to be submitted to Lender all information required by Lender to evaluate the easement, and if Lender determines that the easement shall not materially affect the operation of the Property or Lender's interest in the Property and Borrower pays to Lender, on demand, all cost and expenses incurred by Lender in connection with reviewing Borrower's request.

6.3     <u>Prohibition Absolute</u>.  Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligations immediately due and payable upon the occurrence of a Transfer without Lender's prior written consent or as otherwise expressly permitted herein.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer, except for those expressly allowed herein.  Any Transfer made in contravention of this Section shall be null and void and of no force and effect.

**ARTICLE SEVEN - EVENTS OF DEFAULT AND REMEDIES**

7.1.     <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events, whether voluntary, involuntary, or effected by operation of law, shall constitute an "**Event of Default**" under this Loan Agreement:

7.1.1.   Borrower fails to pay interest, principal, or any other sum due under the terms of this Loan Agreement, the Note, or any other Loan Document within ten (10) days after such payment is due; or

7.1.2.   Any Transfer occurs in violation of the provisions of Article Six hereof; or

7.1.3.   Borrower assigns or attempts to assign this Loan Agreement, any rights hereunder, or any Advance to be made hereunder to any Person, or if Borrower's interest in or rights under this Loan Agreement are voluntarily or involuntarily transferred to any Person, by operation of law or otherwise, including, without limitation, such transfer by Borrower as debtor-in-possession or by a trustee for Borrower under the United States Bankruptcy Code, whether or not the Obligations are assumed by such Person; or

7.1.4.   Any Borrower Party files a voluntary petition in bankruptcy or any Borrower Party is adjudicated as bankrupt or insolvent, or any Borrower Party files any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief for such Borrower Party under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors, or any Borrower Party seeks or consents to, or acquiesces in, the appointment of any trustee, receiver, or liquidator of such Borrower Party or of all or any substantial part of such Borrower Party's property or of any or all of the rents, revenues, issues, earnings, profits, or income thereof, or any Borrower Party makes any general assignment for the benefit of creditors or admits in writing an inability to pay such Borrower Party's debts generally as they become due; or

7.1.5.   A court of competent jurisdiction enters an order, judgment, or decree approving a petition filed against any Borrower Party seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors, which order, judgment, or decree remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or any trustee, receiver, or liquidator is appointed for any Borrower Party or of all or any substantial part of such Borrower Party's property or of any or all of the rents, revenues, issues, earnings, profits, or income thereof, which appointment remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

7.1.6.   Any certificate, statement, representation, warranty, or audit, whether written or unwritten, heretofore or hereafter furnished by or on behalf of any Borrower Party pursuant to or in connection with the Commitment, this Loan Agreement or otherwise (including, without limitation, representations and warranties contained herein) or as an inducement to Lender to extend any credit to or to enter into this or any other agreement with Borrower proves to have been false in any material respect at the time as of which the facts therein set forth were stated or certified or to have omitted any substantial contingent or unliquidated liability or claim against any Borrower Party, or if on the date of execution of this Loan Agreement any materially adverse change has occurred in any of the facts previously disclosed by any such certificate, statement, representation, warranty, or audit, and such change was not disclosed to Lender at or prior to the time of the execution of this Loan Agreement; or

7.1.7.   The Title Company fails or refuses, by reason of any matter affecting title to the Property, to insure any Advance as giving rise to a valid first priority security title in and to the Property, subject only to the Permitted Encumbrances, which failure is not cured within thirty (30) days after notice from Lender to Borrower thereof; or

7.1.8.   Borrower fails to complete the construction of the Improvements and satisfy the conditions set forth in Section 3.3 of this Loan Agreement on or before the Completion Date, or work on the construction of the Improvements ceases for any period of ten (10) consecutive days, provided that any delays in construction caused by acts of God, acts of war, acts of terrorism, embargo, riots, strikes, labor disturbances, unavailability or materials or labor not caused by Borrower, or the order of any court or tribunal shall extend the Completion Date pro tanto; or

7.1.9.   Any Guarantor who is a natural Person dies or is declared legally incompetent, provided that any such event shall not constitute an Event of Default if, within ninety (90) days of such event, the estate of the deceased or incompetent Guarantor assumes all liability under the applicable Guaranty Agreement or Borrower provides a substitute guarantor that is acceptable to Lender in Lender's sole and uncontrolled discretion; or

7.1.10.   Omitted.

7.1.11.   A final judgment in an amount equal to or greater by $50,000 is entered by a court of law or equity against any Borrower Party that remains undischarged for a period of thirty (30) days, unless such judgment is either (i) fully covered by collectible insurance and such insurer has within such period acknowledged such coverage in

writing, or (ii) although not fully covered by insurance, enforcement of such judgment has been effectively stayed, such judgment is being contested or appealed by appropriate proceedings and such Borrower Party has established reserves adequate for payment in the event such Borrower Party is ultimately unsuccessful in such contest or appeal and evidence thereof is provided to Lender; or

7.1.12.  Borrower fails to properly and timely to perform or observe any other covenant or condition set forth in this Loan Agreement that is not cured within any applicable cure period as set forth herein or, if no cure period is specified therefor, is not cured within twenty (20) days of Lender's notice to Borrower thereof; provided that, if such default is not reasonably susceptible to cure within such twenty (20) days period and Borrower diligently and continuously pursues the cure of such default, then upon Borrower's written request therefor, Lender shall grant a reasonable extension of such cure period, but not exceeding sixty (60) days; or

7.1.13.  Any default or event of default (other than those specified elsewhere in this Section) occurs pursuant to and as defined in any of the other Loan Documents.

7.2.  <u>Remedies</u>.  Upon the occurrence of any Event of Default, Lender may, at its option exercise any or all of the following rights and remedies:

7.2.1.  Declare the entire unpaid principal of the Obligations to be, and the same shall thereupon become, immediately due and payable, without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived; and

7.2.2.  Proceed to protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgment), suit in equity and other appropriate proceedings including, without limitation, for specific performance of any covenant or condition contained in this Loan Agreement; and

7.2.3.  Apply any sums then held in escrow or otherwise by Lender in accordance with the terms of this Loan Agreement or any of the other Loan Documents to the payment of the Obligations in such order, priority, and proportions as Lender shall deemed appropriate in its discretion;

7.2.4.  Take immediate possession of the Property, as well as all other property to which title is held by Borrower as is necessary to fully complete all onsite and offsite Improvements and complete the construction and equipping of the Improvements and do anything in its sole judgment to fulfill the obligations of Borrower hereunder, including availing itself of and procuring performance of existing contracts, amending the same, or entering into new contracts with the same contractors or others and employment of watchmen to protect the Property from injury.  Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the premises to (i) complete construction and equip the Improvements, (ii) use unadvanced Loan funds or funds that Borrower has deposited with Lender at any time pursuant to this Loan Agreement, or advance funds in excess of the Loan to complete the Improvements (and Borrower agrees to reimburse Lender for any costs of such completion that exceed undisbursed Loan funds), (iii) pay all taxes and assessments on the Property when due and to add the amounts of any such payments to the Obligations, (iv) make changes in the Plans and Specifications that Lender deems necessary or desirable to complete the

Improvements in substantially the manner contemplated by the Plans and Specifications, (iv) retain or employ new general contractors, subcontractors, architects, engineers, or inspectors as Lender deems necessary or desirable to complete the Improvements, (v) pay, settle, or compromise all bills and claims that might be incurred in connection with constructing and equipping the Improvements, (vi) purchase any fixtures, equipment, machinery, furniture, or any other personal property as Lender deems necessary or desirable for the completion of the construction and equipping of the Improvements or for the clearance of title to the Land, (vii) execute all applications and certificates in the name of Borrower that might be required, (viii) prosecute and defend all actions or proceedings in connection with the Property, fixtures, equipment, machinery, furniture, or any other personal property, and (ix) do any act that Borrower might do in its own behalf relating to the Property, it being understood and agreed that this power of attorney is a power coupled with an interest and cannot be revoked. All reasonable sums expended or advanced by Lender for any of the foregoing purposes, whether or not in excess of the Loan amount, shall be deemed to have been requested by and paid to Borrower, shall be additional Obligations of Borrower immediately due and payable, shall be evidenced and secured by the Loan Documents, and shall bear interest at the Default Rate retroactive to the date such sums are expended by Lender; and

7.2.5.    Exercise any and all rights and remedies afforded by the laws of the United States, the state in which the Property is located or any other appropriate jurisdiction as may be available for the collection of debts and enforcement of covenants and conditions such as those contained in this Loan Agreement and the other Loan Documents; and

7.2.6.    Exercise the rights and remedies of setoff and/or banker's lien against the interest of Borrower in and to every account (whether time or demand, general or special, provisionally credited or finally credited, or otherwise) now or hereafter maintained by Borrower for its own account with Lender and any branch, subsidiary, or affiliate of Lender, or any Person who then owns a participating interest in the Loan, to the extent of the full amount of the Obligations; and

7.2.7.    Exercise any and all rights and remedies contained in the other Loan Documents and any and all rights of a secured party under the Uniform Commercial Code in effect in the state where the Property is located or under other applicable law, all of which rights and remedies shall be cumulative and non-exclusive.

## ARTICLE EIGHT - MISCELLANEOUS PROVISIONS

8.1    <u>Loan Agreement Part of Note and Other Loan Documents</u>.  The Note and the other Loan Documents specifically incorporate this Loan Agreement by reference, and in the event that the Note and the other Loan Documents are duly assigned, this Loan Agreement shall be considered assigned in like manner.  If a conflict exists or arises between any of the provisions of this Loan Agreement and any other Loan Document, the provisions of this Loan Agreement shall control.

8.2    <u>Indemnification</u>.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (defined below) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions,

proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, or punitive damages, of whatever kind or nature (including, but not limited to reasonable attorney's fees and other costs of defense) (the "Losses") imposed upon or incurred by or asserted against any Indemnified Party (but excluding Losses arising out of Lender's gross negligence or willful misconduct) and directly or indirectly arising out of or in any way relating to (i) Lender's interest in the Property or Lender's relationship with any Borrower Party by virtue of Lender's ownership of the Loan, the Note, the Security Documents, or any other Loan Document, (ii) any amendment to, or restructuring of, the Loan or the Loan Documents; (iii) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Loan Agreement, the Security Documents, or any of the other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, Guarantor, and/or any member, partner, joint venturer, or shareholder of Borrower becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding, (iv) any accident, injury to or death of persons or loss of or damage to property occurring  in, on or about the Property or any part thereof or adjacent parking areas, streets or ways, (v) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets, or ways, (vi) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Loan Agreement, the Security Documents, or any of the other Loan Documents, (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof, (viii) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement or Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with the Loan, or to supply copy thereof in a timely fashion to the recipient of the proceeds of the Loan, (ix) any failure of the Property to be in compliance with any Legal Requirement, (x) the enforcement by any Indemnified Party of the provisions of this Section, (xi) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan, or (xii) any misrepresentation made by Borrower in this Loan Agreement or in any of the other Loan Documents.  Any amounts payable to Lender by reason of the application of this Section shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.  For purposes of this Section, the term "**Indemnified Parties**" means Lender and any Person who is or shall have been involved in the origination or administration of the Loan, any Person in whose name the encumbrance created by the Security Documents is or shall have been recorded, Persons who may hold or acquire or shall have held a full or partial interest in the Loan (including, but not limited to Investors or prospective investors who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, members, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any other Person who holds or acquires or shall have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business.

8.3     Costs and Expenses.  Borrower shall bear all taxes, fees, and expenses (including reasonable fees and expenses of counsel for Lender) in connection with the Loan, the Note, the

preparation and, if applicable, the recordation of this Loan Agreement and the other Loan Documents, and in connection with any amendments, waivers, or consents pursuant to the provisions hereof hereafter made and any workout or restructuring relating to the Loan. If, at any time, an Event of Default occurs or Lender becomes a party to any suit or proceeding in order to protect its interests or priority in the Property or its rights under this Loan Agreement or any of the other Loan Documents, or if Lender is made a party to any suit or proceeding by virtue of the Loan, this Loan Agreement, or the Property and as a result of any of the foregoing, Lender employs counsel to advise or provide other representation with respect to this Loan Agreement, the Property, or to collect the Obligations, or to take any action in or with respect to any suit or proceeding relating to this Loan Agreement, any of the other Loan Documents, the Property, Borrower, or any other Borrower Party, or to protect, collect, or liquidate any of the Property, or attempt to enforce any security interest or lien granted to Lender by any of the Loan Documents, then in any such event, all of the attorney's fees arising from such services, including fees on appeal and in any bankruptcy proceedings, and any expenses, costs, and charges relating thereto shall constitute additional obligations of Borrower to Lender payable on demand of Lender. Without limiting the foregoing, Borrower has undertaken the obligation for payment of, and shall pay, all recording and filing fees, revenue or documentary stamps or taxes, intangibles taxes, transfer taxes, recording taxes and other taxes, expenses and charges payable in connection with this Loan Agreement, any of the other Loan Documents, the Obligations, or the filing of any financing statements or other instruments required to effectuate the purposes of this Loan Agreement, and if Borrower fails to do so, Borrower agrees to reimburse Lender for the amounts paid by Lender, together with penalties or interest, if any, incurred by Lender as a result of underpayment or nonpayment. This Section shall survive for eighteen (18) months after repayment of the Obligations.

8.4    Assignability.   Neither this Loan Agreement, nor any rights or obligations hereunder, nor any Advance to be made hereunder, is assignable by Borrower. The rights of Lender under this Loan Agreement are assignable in part or wholly and any assignee of Lender shall succeed to and be possessed of the rights of Lender hereunder to the extent of the assignment made, including the right to make Advances to Borrower or any approved assignee of Borrower in accordance with this Loan Agreement.

8.5    Relationship of the Parties.   Borrower agrees that its relationship with Lender is solely that of debtor and creditor. Nothing contained in this Loan Agreement or in any other Loan Document shall be deemed to create a partnership, tenancy-in-common, joint tenancy, joint venture, or co-ownership by or between Borrower and Lender, or make Lender the agent or representative of Borrower. Lender shall not be in any way liable or responsible for any debts, losses, obligations, or duties of Borrower with respect to the Property or otherwise, including, without limitation, any debts, obligations, or duties owed at any time to materialmen, contractors, craftsmen, laborers, or others for goods delivered to or services performed by them in relation to the Property, it being understood that no contractual relationship, either expressed or implied, exists between Lender and any materialmen, subcontractors, craftsmen, laborers, or any other person supplying any work, labor, or materials for the Property. Borrower, at all times consistent with the terms and provisions of this Loan Agreement and the other Loan Documents, shall be free to determine and follow its own policies and practices in the conduct of its business.

8.6    <u>Participation</u>.  Borrower acknowledges and agrees that Lender may, at its option, sell participation interests in the Loan to other participating lenders, provided, however, that Borrower shall continue to be entitled to deal with Lender as though no such participations had been sold.  Borrower agrees with all present and future such participants that if an Event of Default occurs, each participant shall have all of the rights and remedies of Lender with respect to any deposit due from any participant to Borrower, including, without limitation, the right to set off such deposits against Borrower's obligations hereunder.  The execution by a participant of a participation agreement with Lender and the execution by Borrower of this Loan Agreement, regardless of the order of execution, with a copy to Borrower, shall evidence an agreement between Borrower and such participant in accordance with the terms hereof.

**ARTICLE NINE - DOCUMENT PROTOCOLS**

This Loan Agreement and each of the other Loan Documents shall be governed by the following protocols (the "**Document Protocols**"), unless any Loan Document expressly states that the Document Protocols shall not apply to such Loan Document in whole or in part:

9.1    <u>General Rules of Usage</u>.  These Document Protocols shall apply to such Loan Document as from time to time amended, modified, replaced, restated, extended or supplemented, including by waiver or consent, and to all attachments thereto and all other documents or instruments incorporated therein.  When used in any Loan Document governed by these Document Protocols, (i) references to a Person are, unless the context otherwise requires, also to its heirs, executors, legal representatives, successors, and assigns, as applicable, (ii) "hereof," "herein," "hereunder" and comparable terms refer to the entire Loan Document in which such terms are used and not to any particular article, section, or other subdivision thereof or attachment thereto, (iii) references to any gender include, unless the context otherwise requires, references to all genders, and references to the singular include, unless the context otherwise requires, references to the plural, and vice versa, (iv) "shall" and "will" have equal force and effect, (v) references in a Loan Document to "Article," "Section," "paragraph" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, paragraph, or subdivision of or an attachment to such Loan Document, (vi) all accounting terms not otherwise defined therein have the meanings assigned to them in accordance with GAAP, and (vii) "include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

9.2    <u>Notices</u>.  All notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of such Loan Document (a "**notice**") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address, (ii) three (3) Business Days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, or (iii) one Business Day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

<table>
<tr><td>**Lender:**</td><td>SouthTrust Bank<br>420 North Twentieth Street</td></tr>
</table>

8.6    <u>Participation</u>. Borrower acknowledges and agrees that Lender may, at its option, sell participation interests in the Loan to other participating lenders, provided, however, that Borrower shall continue to be entitled to deal with Lender as though no such participations had been sold. Borrower agrees with all present and future such participants that if an Event of Default occurs, each participant shall have all of the rights and remedies of Lender with respect to any deposit due from any participant to Borrower, including, without limitation, the right to set off such deposits against Borrower's obligations hereunder. The execution by a participant of a participation agreement with Lender and the execution by Borrower of this Loan Agreement, regardless of the order of execution, with a copy to Borrower, shall evidence an agreement between Borrower and such participant in accordance with the terms hereof.

## ARTICLE NINE - DOCUMENT PROTOCOLS

This Loan Agreement and each of the other Loan Documents shall be governed by the following protocols (the "**Document Protocols**"), unless any Loan Document expressly states that the Document Protocols shall not apply to such Loan Document in whole or in part:

9.1    <u>General Rules of Usage</u>. These Document Protocols shall apply to such Loan Document as from time to time amended, modified, replaced, restated, extended or supplemented, including by waiver or consent, and to all attachments thereto and all other documents or instruments incorporated therein. When used in any Loan Document governed by these Document Protocols, (i) references to a Person are, unless the context otherwise requires, also to its heirs, executors, legal representatives, successors, and assigns, as applicable, (ii) "hereof," "herein," "hereunder" and comparable terms refer to the entire Loan Document in which such terms are used and not to any particular article, section, or other subdivision thereof or attachment thereto, (iii) references to any gender include, unless the context otherwise requires, references to all genders, and references to the singular include, unless the context otherwise requires, references to the plural, and vice versa, (iv) "shall" and "will" have equal force and effect, (v) references in a Loan Document to "Article," "Section," "paragraph" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, paragraph, or subdivision of or an attachment to such Loan Document, (vi) all accounting terms not otherwise defined therein have the meanings assigned to them in accordance with GAAP, and (vii) "include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

9.2    <u>Notices</u>. All notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of such Loan Document (a "**notice**") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address, (ii) three (3) Business Days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, or (iii) one Business Day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

      **Lender:**                        SouthTrust Bank
                                           420 North Twentieth Street

SouthTrust Tower - 8th Floor
Birmingham, Alabama 35203
Attention: Commercial Real Estate Loan Dept.

**with a copy to** (which alone shall not constitute notice):

William T. McKenzie, Esq.
Burr & Forman LLP
One Georgia Center, Suite 1200
600 West Peachtree Street, NW
Atlanta, Georgia 30308

**Borrower:**

5300 Peachtree, L.P.
c/o Charter Companies
730 N. Dean Road, Suite 200
Auburn, Alabama 36830
Attention: Miles Hill

**with a copy to** (which alone shall not constitute notice):

Russell C. Balch, Esq.
Akridge & Balch, P.C.
730 N. Dean Road, Suite 300
Auburn, Alabama 36830

**Guarantors:**

Miles E. Hill, Jr.
c/o Charter Companies
730 N. Dean Road, Suite 200
Auburn, Alabama 36830

Fred Bennett
c/o Charter Companies
730 N. Dean Road, Suite 200
Auburn, Alabama 36830

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Rejection or refusal to accept, or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed to be receipt of any such notice. Any notice to an entity shall be deemed to be given on the date specified in this Section without regard to when such notice is delivered by the entity to the individual to whose attention it is directed and without regard to the fact that proper delivery may be refused by someone other than the individual to whose attention it is directed. If a notice is received by an entity, the fact that the individual to whose attention it is directed is no longer at such address or associated with

such entity shall not affect the effectiveness of such notice. Notices may be given on behalf of any party by such party's attorneys.

9.3    Severability. Whenever possible, each provision of such Loan Document shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of such Loan Document shall be prohibited by or invalid or unenforceable under the applicable law of any jurisdiction with respect to any Person or circumstance, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability, without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provisions in any other jurisdiction or with respect to other Persons or circumstances. To the extent permitted by applicable law, the parties to such Loan Document thereby waive any provision of law that renders any provision thereof prohibited, invalid or unenforceable in any respect.

9.4    Remedies Not Exclusive. No remedy therein conferred upon or reserved to Lender is intended to be exclusive of any other remedy or remedies available to Lender under such Loan Document, at law, in equity or by statute, and each and every such remedy shall be cumulative and in addition to every other remedy given thereunder or now or hereafter existing at law, in equity or by statute.

9.5    Liability. If Borrower or Guarantor consists of more than one Person, the obligations and liabilities of each such Person under such Loan Document shall be joint and several, except as expressly provided to the contrary in such Loan Document.

9.6    Binding Obligations; Covenants Run with the Land. Such Loan Document shall be binding upon Borrower or Guarantor, as the case may be, and the successors, assigns, heirs and personal representatives of Borrower or Guarantor, as the case may be, and shall inure to the benefit of Lender and all subsequent holders of such Loan Document and their respective officers, directors, employees, shareholders, agents, successors and assigns. Nothing in such Loan Document, whether express or implied, shall be construed to give any Person (other than the parties thereto and their permitted successors and assigns and as expressly provided therein) any legal or equitable right, remedy or claim under or in respect of such Loan Document or any covenants, conditions or provisions contained therein. If such Loan Document is to be recorded, all of the grants, covenants, terms, provisions, covenants and conditions of such Loan Document shall run with the land.

9.7    No Oral Modifications. Such Loan Document, and any of the provisions thereof, cannot be altered, modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Borrower, Guarantor, or Lender, but only by an agreement in writing signed by the party against whom enforcement of any alteration, modification, amendment, waiver, extension, change, discharge or termination is sought. Without limiting the generality of the foregoing, any payment made by Lender for insurance premiums, impositions or any other charges affecting the Property shall not constitute a waiver of Borrower's or any Guarantor's default in making such payments and shall not obligate Lender to make any further payments.

9.8    Entire Agreement. Such Loan Document, together with the other applicable Loan Documents and this Rider, constitutes the entire agreement of the parties thereto with respect to the subject matter thereof and supersedes all prior written and oral agreements and understandings with respect to such subject matter.

9.9    Waiver of Acceptance. Borrower and Guarantor hereby waive any acceptance of such Loan Document by Lender in writing, and such Loan Document shall immediately be binding upon Borrower or Guarantor, as the case may be.

9.10    Jurisdiction, Court Proceedings. Each of Lender, Borrower, and Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, (i) submits to personal, nonexclusive jurisdiction in the State of Georgia with respect to any suit, action, or proceeding by any person arising from, relating to, or in connection with such Loan Document or the Loan, (ii) agrees that any such suit, action, or proceeding may be brought in any state or federal court of competent jurisdiction sitting in the State of Georgia, and (iii) submits to the jurisdiction of such courts. Each of Borrower and Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, further agrees that it shall not bring any action, suit, or proceeding in any forum other than in the state or federal courts of the State of Georgia (but nothing herein shall affect the right of Lender to bring any action, suit, or proceeding in any other forum), and irrevocably agrees not to assert any objection which it may ever have to the laying of venue of any such suit, action, or proceeding in any federal or state court located in Georgia and any claim that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

9.11    Waiver of Counterclaim. Borrower and Guarantor each hereby knowingly waives the right to assert any counterclaim, other than a compulsory or mandatory counterclaim, in any action or proceeding brought against either of them by Lender.

9.12    Waiver of Jury Trial. Borrower, Guarantor, and Lender, to the full extent permitted by law, each hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, waives, relinquishes, and forever forgoes hereby the right to a trial by jury in any action or proceeding, including, without limitation, any tort action, brought by any of them against the other based upon, arising out of, or in any way relating to or in connection with such Loan Document, the Loan, or any course of conduct, act, omission, course of dealing, statements (whether verbal or written) or actions of any Person (including, without limitation, such Person's directors, officers, partners, members, employees, agents or attorneys, or any other Persons affiliated with such Person), in connection with the Loan or such Loan Document, including, without limitation, in any counterclaim which Borrower or Guarantor may be permitted to assert thereunder or which may be asserted by Lender against Borrower or Guarantor, whether sounding in contract, tort, or otherwise. This waiver by Borrower and Guarantor of their right to a jury trial is a material inducement for Lender to make the Loan.

9.13    No Waivers by Lender. No delay or omission of Lender in exercising any right or power accruing upon any default under such Loan Document shall impair any such right or power or shall be construed to be a waiver of any default under such Loan Document or any acquiescence therein, nor shall any single or partial exercise of any such right or power or any

abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. Acceptance of any payment after the occurrence of a default under such Loan Document shall not be deemed to waive or cure such default under such Loan Document; and every power and remedy given by such Loan Document to Lender may be exercised from time to time as often as may be deemed expedient by Lender. Borrower and Guarantor hereby waive any right to require Lender at any time to pursue any remedy in Lender's power whatsoever.

9.14    Waiver of Notice.    Neither Borrower nor Guarantor shall be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which such Loan Document specifically and expressly provides for the giving of notice by Lender to Borrower or Guarantor, as the case may be, and except with respect to matters for which Borrower or Guarantor, as the case may be, is not, pursuant to applicable legal requirements, permitted to waive the giving of notice. Each of Borrower and Guarantor hereby expressly waives the right to receive any notice from Lender with respect to any matter for which such Loan Document does not specifically and expressly provide for the giving of notice by Lender to Borrower or Guarantor, as the case may be. Any provision of such Loan Document which expressly provides for the giving of notice by Lender to Borrower or Guarantor shall be deemed eliminated *ab initio* if Lender is prevented from giving such notice by bankruptcy or other applicable law.

9.15    Offsets, Counterclaims and Defenses.    Any assignee of such Loan Document from Lender or any successor or assignee of Lender shall take the same free and clear of all offsets, counterclaims, or defenses that are unrelated to such Loan Document which Borrower or Guarantor may otherwise have against any assignor of such Loan Document, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or Guarantor in any action or proceeding brought by any such assignee upon such Loan Document, and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower and Guarantor.

9.16    Time of the Essence.    Time shall be of the essence in the performance of all obligations of Borrower and Guarantor under such Loan Document.

9.17    Governing Law.    Such Loan Document shall be governed by, and construed in accordance with, the laws of the State of Georgia.

9.18    Sole Discretion of Lender.    Wherever pursuant to such Loan Document, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender exercised in subjective good faith and shall be final and conclusive, except as may be otherwise specifically provided therein. In addition, Lender shall have the right to refuse to grant its consent, approval or acceptance or to indicate its satisfaction whenever such consent, approval, acceptance or satisfaction shall be required under such Loan Document, subject to the applicable standard of discretion.

9.19    Counterparts.  Such Loan Documents may be executed in any number of separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which, collectively and separately, shall constitute one and the same Loan Document.  All signatures need not be on the same counterpart.  The failure of any party thereto to execute such Loan Document, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

9.20    Exhibits Incorporated; Headings.  The information set forth on the cover of such Loan Document, the table of contents, the headings, and the exhibits annexed thereto, if any, shall be deemed to be incorporated therein as a part thereof with the same effect as if set forth in the body thereof.  The headings and captions of the various articles, sections, and paragraphs of such Loan Document are for convenience of reference only and shall not be construed as modifying, defining, or limiting, in any way, the scope or intent of the provisions thereof.

9.21    Interpretation.  No provision of such Loan Document shall be construed against or interpreted to the disadvantage of any party thereto by any court or other governmental or judicial authority by reason of such party's having or being deemed to have structured or dictated such provision.

9.22    Remedies of Borrower and Guarantor.  If Borrower or Guarantor, as the case may be, shall seek the approval or consent of Lender under such Loan Document, which Loan Document expressly provides that Lender's approval shall not be unreasonably withheld, and Lender shall fail or refuse to give such consent or approval, the burden of proof as to whether or not Lender acted unreasonably shall be upon Borrower or Guarantor, as the case may be, provided Lender has given Borrower a written explanation for the disapproval or lack of consent.

9.23    Release of any Party or Collateral.  Lender may at any time, without releasing or impairing the liability of any Person liable upon or in respect of such Loan Document, release, surrender, substitute, or exchange any Collateral securing this Note and may at any time release any other Person primarily or secondarily liable for the Obligations.

9.24    Attorneys' Fees.  Wherever it is provided in such Loan Document that Borrower or Guarantor pay any costs and expenses, such costs and expenses shall include, without limitation, all reasonable attorneys', paralegal and law clerk fees and disbursements, including, without limitation, fees and disbursements at the pre-trial, trial and appellate levels, which are actually incurred or paid by Lender at standard billable rates; provided that the foregoing reference to "reasonable" fees and disbursements (and any other such references in such Loan Document) shall be deemed to include only such fees and disbursement actually incurred at normal billing rates.

9.25    Method of Payment.  All amounts required to be paid by any party to such Loan Document to any other party shall be paid in such freely transferable coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

9.26    True Copy.  By executing such Loan Document, Borrower or Guarantor, as the case may be, acknowledges that it has received a true copy of such Loan Document.

[THE REMAINDER OF THIS PAGE WAS LEFT BLANK INTENTIONALLY]

**IN WITNESS WHEREOF,** Borrower and Lender have caused this Loan Agreement to be executed by their duly authorized representatives under seal as of the date first set forth above, with the intention that this instrument take effect as an instrument under seal.

**5300 PEACHTREE, L.P.,**
an Alabama limited partnership

By:    5300 Peachtree Partners, LLC,
an Alabama limited liability company,
Its General Partner

By: _____
Name: _____
Title: _____

**[EXECUTIONS CONTINUED ON FOLLOWING PAGE]**

**SOUTHTRUST BANK,**
an Alabama banking corporation

By: _____ (L.S.)
Richard B. Carriker,
Vice President

[END OF EXECUTIONS]

## EXHIBIT A

**CONSTRUCTION BUDGET**
**5300 Peachtree**

| 7/8/2003 | | Total Cost | | Equity | | Loan |
|---|---|---|---|---|---|---|
| **HARD COSTS** | | | | | | |
| Land | $ | 3,287,415 | $ | 3,287,415 | $ | . |
| Sitework | $ | 1,240,320 | | | $ | 1,240,320 |
| Bldrs. Risk, Subs' Bonds | $ | 85,000 | | | $ | 85,000 |
| Building Consturction | $ | 12,028,680 | | | $ | 12,028,680 |
| Parking Deck | $ | 1,800,000 | | | $ | 1,800,000 |
| General Requirments | $ | 357,700 | | | $ | 357,700 |
| Building Contingency | $ | 600,000 | | | $ | 600,000 |
| GC Profit & Overhead | | $675,844 | | | $ | 675,844 |
| **TOTAL** | $ | 20,074,959 | $ | 3,287,415 | $ | 16,787,544 |
| **NECESSARY SOFT COSTS** | | | | | | |
| Impact Fees | $ | 250,000 | | | $ | 250,000 |
| Architect, Eng.,Permitting | $ | 413,500 | | | $ | 413,500 |
| Interior/Model Design | $ | 15,000 | | | $ | 15,000 |
| Landscape Design | $ | 23,000 | | | $ | 23,000 |
| Surveys | $ | 16,000 | | | $ | 16,000 |
| Interest Reserve | $ | 725,000 | | | $ | 725,000 |
| Financing Fees | $ | 121,250 | | | $ | 121,250 |
| Legal | $ | 123,000 | | | $ | 123,000 |
| Market Studies | $ | 6,500 | | | $ | 6,500 |
| Soils Tests | $ | 6,000 | | | $ | 6,000 |
| Environmentals I & II & Legal | $ | 37,500 | | | $ | 37,500 |
| FAA Consultant | $ | 2,000 | | | $ | 2,000 |
| Appraisal | $ | 5,000 | | | $ | 5,000 |
| RE Taxes | $ | 20,000 | | | $ | 20,000 |
| Insurance | $ | 30,000 | | | $ | 30,000 |
| Initial Operating costs/Rent up | $ | 185,000 | | | $ | 185,000 |
| Marketing | $ | 67,000 | | | $ | 67,000 |
| Lender Inspections | $ | 5,000 | | | $ | 5,000 |
| Closing Costs; | $ | 100,000 | $ | 100,000 | $ | . |
| Accounting | $ | 5,000 | | | $ | 5,000 |
| **TOTAL** | $ | 2,155,750 | $ | 100,000 | $ | 2,055,750 |
| **SOFT COSTS FINANCING** | | | | | | |
| Financial Consulting | $ | 100,000 | $ | 100,000 | $ | - |
| Equity Costs | $ | 350,000 | $ | 350,000 | $ | - |
| Pre Development costs | $ | 50,000 | $ | 50,000 | $ | - |
| Soft costs contingency | $ | 100,000 | $ | 100,000 | $ | - |
| **TOTAL** | $ | 600,000 | $ | 600,000 | $ | - |
| **SOFT COSTS DEVELOPER** | | | | | | |
| Developer's Fee | $ | 350,000 | | 350,000 | $ | - |
| **TOTAL** | $ | 350,000 | $ | 350,000 | $ | - |
| **TOTALS:** | $ | 23,180,709 | $ | 4,337,415  $0 | $ | 18,843,294 |

| **Equity as % of Costs:** | | **18.71%** |
|---|---|---|
| Loan Fee: .5% of Loan Amt. | $ | 94,216 |

NRHMPTN.xls

## THIRD MODIFICATION TO LOAN AGREEMENT

**THIS AGREEMENT**, made as of the 21st day of March, 2007, is by and between **5300 PEACHTREE, L.P.**, an Alabama limited partnership ("Borrower"), and **WACHOVIA BANK, NATIONAL ASSOCIATION**, a national banking association and successor by merger to SouthTrust Bank (the "Lender").

## R E C I T A L S:

A.    Reference is hereby made to that certain Loan Agreement dated as of September 30, 2003, by and between Borrower and Lender, as amended by that certain First Modification to Loan Agreement dated as of January 31, 2006, as further amended by that certain Second Modification to Loan Agreement dated as of July 28, 2006 (as so amended, and as hereafter amended, modified, extended or renewed, the "Loan Agreement"). All capitalized terms used herein without definition shall have the respective meanings set forth in the Loan Agreement.

B.    The outstanding principal balance of the Loan as of the date of this Agreement is $16,373,611.78. In order to provide additional funds necessary to complete the Project, the Borrower has requested that up to $7,773,361.00 in Loan proceeds (the "Increase"), be re-advanced to Borrower, resulting in a maximum outstanding principal amount of $24,146,972.78 evidenced by the Note and secured by the Loan Agreement and the other Loan Documents. Lender has agreed to fund the Increase upon the terms and conditions set forth in this Agreement, and the parties now desire to amend the Loan Agreement as set forth herein.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing Recitals, the parties hereto agree as follows:

1.    ***Recitals.*** The parties hereby acknowledge the foregoing Recitals to be true and correct in all material respects.

2.    ***Re-Advance of Principal.*** In accordance with the terms of the Loan Agreement, as modified hereby, Lender hereby agrees to re-advance Loan proceeds to Borrower in a principal amount of up to $7,773,361.00.

3.    ***Revised Project Budget.*** The construction cost budget attached to the Loan Agreement as Exhibit A is hereby deleted in its entirety, and the revised cost budget attached to this Amendment as Exhibit A-1 is hereby substituted as the applicable "Project Budget" under the Loan Agreement. Borrower agrees that the principal of the Loan shall be advanced in accordance with the terms of the Loan Agreement and the revised Project Budget attached hereto as Exhibit A-1.

4.    ***Additional Equity.***

(a)    The Borrower shall cause additional equity to be injected into the Project in an amount sufficient to cover all costs of completion in excess of the Increase (the "Additional Equity"). As reflected in the Project Budget attached hereto as Exhibit A-1, the Borrower's

1550937 v4



Additional Equity is presently estimated to be $2,175,055.00. Nothing herein shall be deemed an assurance by Lender that the Additional Equity shall be sufficient to complete the Project. To the contrary, the Borrower's obligation to keep the Loan in balance as set forth in Section 5.2.3 of the Loan Agreement shall at all times remain in effect.

(b)    .Borrower has represented to Lender that $1,327,978 of the Additional Equity has heretofore been expended by Borrower in payment of Project costs set forth in the revised Project Budget attached hereto as Exhibit A-1 (the "Funded Equity"). Within ten (10) days after the date of this Agreement, Borrower shall provide all such back-up documentation as may be requested by Lender's Consultant in order to authenticate such expenditures to the reasonable satisfaction of Lender's Consultant. In the event of any dispute as to the amount of Funded Equity expended or its applicability to the Project Budget, the opinion of Lender's Consultant shall be binding upon the parties. Within two (2) business days after issuance by Lender's Consultant of its written findings with respect to the Funded Equity and the application thereof in payment of Project costs set forth in the revised Project Budget attached hereto as Exhibit A-1, Borrower shall deposit with Lender, in collected funds, an amount equal to (i) the balance of the Additional Equity in the amount of $847,077, plus (ii) any shortfall in the Funded Equity determined by Lender's Consultant, failing which an Event of Default shall, at the option of Lender, be deemed to have occurred under the Loan Documents. Lender shall disburse all Additional Equity received by it (including any shortfall in the Funded Equity) in payment of budgeted Project costs in accordance with the applicable provisions of the Loan Agreement in the same manner as, and subject to all terms and conditions of, the disbursement of Loan Proceeds. No portion of the Increase shall be funded until such time as the Additional Equity has been fully disbursed in payment of budgeted Project costs.

(c)    Borrower hereby agrees that all fees or expenses set forth in the Project Budget which are payable to Borrower or to any principal or affiliate of Borrower shall remain undisbursed until such time as the lien-free completion of the Project has been achieved; provided, however, that the disbursement constraint contained in this paragraph shall not apply to any and all payments (i) due to the General Contractor under the Construction Contract, or (ii) due to Charter Real Estate Services, LLC, as real estate brokerage commission payments in connection with the sale of condominium units comprising the Project.

5.    *Reporting.*  In addition to the periodic reports required by the Loan Agreement, the Borrower shall provide to Lender, no later than five (5) days after Borrower's receipt thereof, true and correct copies of all commitment letters, term sheets, letters of intent, offers of sale or purchase, option contracts, purchase contracts, swap proposals, or similar materials related to any proposed financing or sale of the Project, any Unit therein, or of the equity interests in Borrower or any of its constituent entities.

6.    *Project Supervision.*  The parties agree that the existing General Contractor for the Project shall remain in place, but no later than seven (7) days after the date of this Agreement Borrower shall retain, at its sole cost and expense, the services of Gary Wert or another general contractor or professional construction manager acceptable to Lender to manage and supervise completion of the Project by the existing General Contractor. Such construction manager shall have authority to provide such on-site Project supervision as it may deem necessary, to review and approve all draw requests, to receive payment of all Loan disbursements, to remit payment

of all sums due the general contractor and all subcontractors or materialmen, to deal directly with Lender, the general contractor and all subcontractors or materialmen serving the Project in all matters related to Project administration and supervision, and generally to perform all functions of the Authorized Representative under the Loan Agreement. No Loan disbursements shall be permitted unless approved by said construction manager. Borrower shall also continue to pay all costs and expenses incurred by the Lender's Consultant in connection with its periodic inspection and review of the Project. Lender has retained Construction Consulting Engineers, LLC (Frank Stegall) to serve as Lender's Consultant. From and after the date of this Agreement, and until Lender shall elect otherwise, the Loan and all disbursements thereunder shall be administered through Lender's Construction Loan Administration department in accordance with the terms of the Loan Documents and Lender's customary standards applicable to construction loans.

7.    *Commitment Fee.*    In consideration of the additional extension of credit evidenced hereby, Borrower agrees to pay to Lender a commitment fee in the amount of $38,866.81, which fee shall be due and payable by Borrower, and shall be deemed fully earned by Lender, upon execution and delivery of this Agreement by Borrower and Lender.

8.    *Interest.*    Within two (2) business days after issuance by Lender's Consultant of its written findings with respect to the Funded Equity pursuant to subsection 4(b) above, and as a condition precedent to Lender's obligation to fund the Increase, Borrower shall pay to Lender from its separate funds an installment of interest in the amount of $400,000.00, which shall be applied by Lender in reduction of accrued but unpaid interest on the outstanding principal balance of the Loan as of the date hereof. The balance of accrued but unpaid interest due after application of said $400,000.00 payment shall be paid by Borrower, from Borrower's separate funds, on the earlier of (i) the maturity date of the Loan, or (ii) the date upon which a final settlement of the Borrower's claims against M&K Plumbing is made and payment of settlement proceeds is received, more particularly described in Section 11 below. Lender shall confirm the balance due in writing after application of said $400,000.00 installment. Nothing herein shall relieve Borrower from the obligation to pay monthly installments of interest coming due under the Note subsequent to the date hereof, as and when the same shall be payable under the terms of the Note.

9.    *Late Fee.*    In order to compensate Lender for its loss as a result of Borrower's late payment of accrued but unpaid interest on the Loan, upon execution and delivery of this Agreement by the parties a late payment fee in the amount of $996,000.00 shall be fully earned by Lender (the "Late Fee"). Said Late Fee shall be due and payable by Borrower on the maturity date of the Loan; provided, however, that (i) if all obligations of Borrower under the Loan Documents have been fully and indefeasibly paid on or before October 15, 2007, then the amount of said Late Fee shall be reduced to $498,000.00, and (ii) if all obligations of Borrower under the Loan Documents have been fully and indefeasibly paid on or before September 15, 2007, the amount of said Late Fee shall be reduced to $248,000.00. Said Late Fee is not included within the principal amount of the Increase as a budgeted cost of the Project, and will instead be payable from Borrower's separate funds.

10.    *Exit Fee.*    In consideration of Lender's agreement to modify the Loan Documents in a manner calculated to achieve a successful completion of the Project for the Borrower's benefit, upon execution and delivery of this Agreement by the parties an exit fee in the amount of

$500,000 shall be fully earned by Lender (the "Exit Fee"). Said Exit Fee shall be due and payable by Borrower on the maturity date of the Loan; provided, however, that if all obligations of Borrower have been fully and indefeasibly paid on or before October 15, 2007, then the amount of said Exit Fee shall be reduced to $300,000. Said Exit Fee is not included within the principal amount of the Increase as a budgeted cost of the Project, and will instead be payable from Borrower's separate funds.

11.    *Assignment of Claims.*

(a)    As additional security for the Obligations, Borrower hereby assigns, sets over and delivers to Lender, and grants to Lender a continuing security interest in, all right, title and interest of Borrower in and to (i) Borrower's pending litigation claim against the plumbing subcontractor for the Project, M&K Plumbing, and (ii) all other claims or causes of action in favor of Borrower, whether now existing or hereafter arising, against all contractors, subcontractors, materialmen or others providing work, labor, services or materials to the Project (collectively, the "Assigned Claims"). After payment of (i) the balance of accrued but unpaid interest due as required by Section 8 above, and (ii) all legal fees and other costs of collection actually incurred by Borrower in connection with the pending litigation against M&K Plumbing (not to exceed $100,000, and to be authenticated by invoices), the balance of all receipts generated from the Assigned Claims shall be deposited into an interest-bearing account with Lender which shall be held as additional security for the Obligations. In the event that Borrower shall experience any cost overruns in any "hard" cost line item of the Project Budget after all contingency amounts and equity contributions have been exhausted, Lender shall allow disbursements to be made from such pledged account to cover such "hard" cost expenses.

(b)    Borrower hereby agrees promptly to notify Lender of the existence of any future Assigned Claim, and to keep Lender apprised of all developments in the course of negotiating, litigating or settling any Assigned Claim. Lender hereby reserves the right to review and approve all matters relating to any Assigned Claim in excess of $100,000, including, without limitation, Borrower's choice of counsel therein and all offers of compromise or settlement thereof.

12.    *Expenses.*    Borrower shall pay, or shall reimburse Lender for, all out-of-pocket costs and expenses incurred by Lender in connection with the preparation, negotiation and execution of this Amendment and the consummation of the transactions contemplated hereby, including, without limitation, all appraisal fees, recording fees and taxes (including intangibles taxes and documentary stamp taxes), title insurance premiums, fees of architects, engineers and surveyors, legal fees and expenses of the Lender's counsel, and fees and expenses of Lender's Consultant.

13.    *General Release.*    In consideration of the agreements of Lender set forth herein, and as a material inducement therefor, Borrower does hereby remise, release and forever discharge Lender and its affiliates, parents, divisions, subsidiaries, successors, predecessors, officers, stockholders, officers, directors, agents, employees, attorneys, successors, and assigns (Lender and such other parties being collectively referred to herein as the "Released Parties"), of and from any and all claims, demands, liabilities, actions and causes of action of every kind or nature, whether known or unknown, suspected or unsuspected, contingent or matured, concealed,

hidden, latent or patent, which may now exist or may in the past have existed, arising out of or in any way connected with any occurrences, acts, omissions, or transactions involving, directly or indirectly, the Loan Documents, any of the Obligations, or any transactions or dealings between Borrower and Lender.

14. *Other Modifications.* To the extent that any other Loan Document contains any provision which is inconsistent with the terms of this Agreement, the terms of this Agreement shall control, and such Loan Document shall be deemed amended hereby in all material respects. In order to effectuate the purposes of this Agreement, Borrower and Lender have also entered into that certain Third Note Modification Agreement of even date herewith modifying the terms of the Note, and that certain Second Amendment to Security Documents of even date herewith modifying the terms of the Security Documents therein defined (the "Second Amendment").

15. *Recording; Title Endorsement.* Borrower agrees that it shall cause the Second Amendment to be duly recorded in the Office of the Clerk of Superior Court of Dekalb County, Georgia, and shall pay all recording fees or taxes in connection therewith. Borrower further agrees that, at Borrower's sole cost and expense, it shall cause an endorsement to be issued to Lender's existing title insurance policy insuring the Security Deed, which endorsement shall (i) change the effective date of such policy to the date and time of recording of the Second Amendment, without the addition of exceptions for intervening matters deemed unsatisfactory by Lender, and (ii) amend the description of the insured instrument to include the Second Amendment, as recorded, and (iii) insure that the principal amount of the Increase may be re-advanced to Borrower on a first priority basis. Lender reserves the right to require such further endorsements to said title policy as Lender may deem appropriate upon review of the current status of title to the Project.

16. *Miscellaneous.*

(a)     This Agreement shall in all respects be governed by and construed in accordance with the Document Protocols set forth in Article 9 of the Loan Agreement, which by this reference are incorporated herein as if set forth in full.

(b)     Borrower hereby represents and warrants to Lender that it has full power and authority to enter into this Agreement, and that this Agreement constitutes the legal, valid, and binding obligation of the Borrower, enforceable in accordance with its terms. Borrower further represents and warrants that there has not occurred, and does not exist, any event, condition, or state of facts, which, with notice or the passage of time or both, would constitute an Event of Default under any Loan Document.

(c)     As herein amended the Loan Agreement shall remain in full force and effect. From and after the date hereof, any and all references to the Loan Agreement contained in any other instrument or document shall be deemed to refer thereto as amended hereby.

(d)     The Loan Agreement and all other Loan Documents, as amended, are hereby ratified and affirmed in all respects. Borrower confirms that, as of the date hereof, it has no defenses or offsets with respect to its obligations set forth in the Loan Documents.

(e)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(f)     This Agreement may be executed in any number of counterparts bearing the original signatures of one or more of the parties hereto, each of which shall for all purposes be deemed an original, but all of which, taken together, shall constitute one and the same Agreement.  It shall not be necessary that all parties execute the same counterpart.

(g)     Time is of the essence in the performance of each and every term, covenant, condition and agreement set forth herein.

**[No further text this page; Signature pages follow.]**

**IN WITNESS WHEREOF**, the undersigned parties have caused this Agreement to be properly executed and delivered as of the day and year first above written.

**BORROWER:**

Signed, sealed and delivered in the presence of:

5300 PEACHTREE, L.P., an Alabama limited partnership

By:    5300 Peachtree Partners, LLC, an Alabama limited liability company, Its General Partner

_T. Denil Brannen_
Unofficial Witness

_Kimiko Y Noble_
Notary Public
My Commission Expires:

By:    _[signature]_

Miles E. Hill, Jr., Managing Member

[Notary Seal]

**LENDER:**

Signed, sealed and delivered in the presence of:

WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association

_Athina William_
Unofficial Witness

By:    _Terri O. Burns_
Print Name:    _TERRI O. BURNS_
Title:    _Assistant Vice President_

_Brittany C. Hamrick_
Notary Public
My Commission Expires:
_1/5/08_

[Notary Seal]

1550937 v4                                                  7

## EXHIBIT A-1

### REVISED COST BUDGET

**EXISTING COST:**

| | | |
|---|---|---|
| Existing Equity | $ 6,068,257 | 19.1% |
| Existing Loan Commitment | 25,766,661 | 80.9%  LTC |
| Total Existing Cost | $31,834,918 | |

**COST INCREASE:**

<u>Hard Costs</u>

| | |
|---|---|
| Construction Contract | $6,021,231 |

<u>Soft Costs</u>

| | |
|---|---|
| Impact Fees | 1,000 |
| Architectural | 20,000 |
| Interior Design/Model | 110 |
| Surveys | 6,000 |
| Construction Interest | 1,720,049 |
| Financing Fees | 55,000 |
| Interest Accrued | 911,526 |
| Legal | 100,000 |
| RE Taxes | 322,000 |
| Insurance | 20,000 |
| Initial Operating | 452,000 |
| FF&E | 13,000 |
| Marketing | 195,000 |
| Construction Inspector | 6,500 |
| Accounting | 5,000 |
| Soft Cost Contingency | 100,000 |
| Total Soft Costs | $3,927,185 |

| | |
|---|---|
| **Total Cost Increase** | **$9,948,416** |
| **Less Loan Increase** | **7,773,361** |
| **Additional Equity** | **$2,175,055** |

**TOTAL COST:**

| | |
|---|---|
| Existing Cost | $31,834,918 |
| Total Cost Increase | 9,948,416 |
| Grand Total Cost | $41,783,334 |

**TOTAL EQUITY:**

| | | |
|---|---|---|
| Existing Equity | $6,068,257 | |
| Additional Equity | 2,175,055 | |
| Grand Total Equity | $8,243,312 | 19.73% |

**TOTAL LOAN:**

| | | |
|---|---|---|
| Original Commitment | $25,766,661 | |
| Loan Increase | 7,776,361 | |
| Grand Total Loan Commitment | $32,540,022 | 80.27%  LTC |

# PROMISSORY NOTE

$18,843,294.00                                            September 30, 2003

**FOR VALUE RECEIVED**, the undersigned **5300 PEACHTREE, L.P.**, an Alabama limited partnership ("Borrower"), promises to pay to the order of **SOUTHTRUST BANK**, an Alabama banking corporation ("**Lender**"), the principal sum of **Eighteen Million Eight Hundred Forty Three Thousand Two Hundred Ninety Four and No/100 Dollars ($18,843,294.00)**, or so much thereof as may have been advanced to Borrower from time to time hereunder in accordance with, and subject to the conditions of, that certain Loan Agreement of even date herewith between Borrower and Lender (as the same might hereafter be amended, extended, supplemented, or restated, the "**Loan Agreement**"), together with interest and other charges as provided herein.

    1.    <u>Interest Rate</u>:

This Note shall bear interest from the date hereof in accordance with the following:

LIBOR Rate. As used herein, "LIBOR Rate" means a rate per annum equal to the "Adjusted London Interbank Offered Rate" for the applicable Interest Period (as hereinafter defined) plus two and one tenth basis points (2.10%). As used herein, the "Adjusted London Interbank Offered Rate" for an applicable Interest Period means a rate per annum equal to the quotient obtained by dividing (i) the applicable "London Interbank Offered Rate" for such Interest Period by (ii) 1.00 minus the "Eurodollar Reserve Percentage". As used herein, the "London Interbank Offered Rate" ("LIBOR") means for the applicable Interest Period the rate per annum at which deposits of United States dollars of amounts equal or comparable to the principal amount of this Note are offered for a term comparable to the Interest Period in the London interbank market, which rates appear on the Money Rates section of the Wall Street Journal as effective for contracts entered into on the first day of each Interest Period, provided that (i) if more than one such offered rate appears on the Money Rates section of the Wall Street Journal, the "London Interbank Offered Rate" for such Interest Period will be the arithmetic average of such offered rates; or (ii) if no such offered rates appear on such page, the "London Interbank Offered Rate" for such Interest Period will be the arithmetic average of rates, quoted by not less than two (2) major banks in the United States as selected by the Lender, at approximately 1:00 p.m., Atlanta, Georgia time, two (2) Eurodollar business days prior to the first day of the applicable Interest Period, at which United States dollar deposits of amounts equal or comparable to the principal amount of this Note are offered for a term comparable to the Interest Period in the London interbank market. As used herein, "Eurodollar Reserve Percentage" means for any day that percentage (expressed as a decimal) which is in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement for a member bank of the Federal Reserve System in respect of "Eurocurrency liabilities". The Eurodollar Reserve Percentage shall be adjusted automatically on and as of the effective date of any change in the Eurodollar Reserve Percentage.

As used in this Note, the term "Interest Period" shall mean each successive period of one (1) Month (as defined below) following the date of this Note, provided that (i) no Interest Period

156416 v2



EXHIBIT
C

may extend beyond the maturity date of this Note and (ii) if any such Interest Period would otherwise end on a day that is not a business day, that Interest Period shall be extended to the next succeeding business day unless the result of such extension would be to extend such Interest Period beyond the maturity of this Note, in which event such Interest Period shall end on the immediately preceding business day. "Month" shall mean with respect to an Interest Period, the interval commencing on the day on which a monthly installment of interest or principal is due hereunder (a "**Monthly Payment Date**") and ending on the day before the next Monthly Payment Date, inclusive; provided that the first Month of the initial Interest Period shall commence on the date of this Note and end on the day before the first Monthly Payment Date.

2.    Advances: Lender agrees, on the terms and subject to the conditions set forth herein and in the Loan Agreement, to make advances to the Borrower from time to time at its request prior to the final maturity date hereof, provided that no advance shall in any event be made which shall increase the unpaid principal balance hereunder above the face amount hereof.

3.    Repayment Terms:

During the period commencing on the date of this Note and ending on August 10, 2006 (the "**Term**"), the principal of and interest on this Note shall be paid as follows:

(i)    On October 10, 2003, and on the tenth (10th) day of each successive calendar month during the Term, Borrower shall pay to Lender all accrued but unpaid interest on the outstanding principal of this Note; and

(ii)    On the last day of the Term (i.e., August 10, 2006), Borrower shall pay the entire principal amount outstanding principal under this Note, together with all accrued but unpaid interest thereon and any other charges due hereunder.

4.    Application of Payments: All payments hereunder shall be applied as follows:

(i)    First, to the payment of any late fees and delinquent interest on the outstanding principal balance;

(ii)    Next, to payment of the current month's interest on the outstanding principal balance;

(iii)    The remainder, if any, to the reduction of outstanding principal.

Payments in federal funds immediately available in the place designated for payment received by Lender prior to 2:00 p.m. local time at said place of payment shall be credited prior to close of business, while other payments may, at the option of Lender, not be credited until immediately available to Lender in federal funds in the place designated for payment prior to 2:00 p.m. local time at said place of payment on a day on which Lender is open for business.

156416 v2                                    2

5.    Prepayment. Borrower may prepay the outstanding principal of this Note, or any part thereof, from time to time on any Monthly Payment Date. Partial prepayments will be applied to principal installments coming due under this Note in their inverse order of maturity. Lender shall not be obligated to adjust any monthly payment due hereunder on account of any partial prepayment of principal. Amounts prepaid may not be reborrowed.

6.    Collection Costs. Lender shall be entitled to recover all costs of collecting, securing, or attempting to collect or secure this Note, or defending any action seeking the avoidance or rescission of any payment of or security for this Note, including, without limitation, court costs and reasonable attorneys' fees actually incurred, including attorneys' fees on any appeal by either Borrower or Lender.

7.    Security. All obligations of Borrower under this Note are secured by the Security Documents and are unconditionally guaranteed by Guarantor pursuant to the Guaranty Agreement.

8.    Events of Default. The occurrence or existence of an Event of Default pursuant to, and as defined in, the Loan Agreement, including, without limitation, Borrower's failure to pay any installment of principal or interest on this Note or any other sum due hereunder on the due date thereof, which failure continues beyond any cure period and notice requirement set forth in the Loan Agreement, will constitute an event of default under this Note (an "**Event of Default**"). Lender, at its option, upon or at any time after the occurrence of an Event of Default, may (i) declare the then outstanding principal amount of this Note, together with all accrued interest thereon and all other agreed or permitted charges owing by Borrower hereunder, to be, and the same will thereupon become, immediately due and payable without notice to or demand upon Borrower, all of which Borrower hereby expressly waives, and (ii) pursue all rights and remedies available under the Loan Documents and at law or in equity. All rights and remedies of Lender under the terms of this Note and the other Loan Documents and applicable statutes or rules of law will be cumulative and may be exercised successively or concurrently.

9.    Usury. It is the intent of Borrower and Lender in the execution of this Note and all other Loan Documents to contract in strict compliance with the usury laws governing the loan evidenced by this Note. In furtherance thereof, Lender and Borrower stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract for the use, forbearance, or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws governing the loan evidenced by the Note. Borrower or any guarantor (including Guarantor), endorser, or other party now or hereafter becoming liable for the payment of the Note shall never be liable for unearned interest on the Note and shall never be required to pay interest on the Note at a rate in excess of the maximum interest that may be lawfully charged under the laws governing the loan evidenced by the Note, and the provisions of this paragraph shall control over all other provisions of the Note and any other instrument executed in connection herewith which may be in apparent conflict herewith. In the event any holder of the Note shall collect monies that are deemed to constitute interest and that would otherwise increase the effective interest rate on the Note to a rate in excess of that permitted to be charged by the laws governing the loan evidenced by the Note, all such sums deemed to constitute interest in excess of the legal rate shall be applied to the unpaid principal balance of the Note and if in excess of such balance, shall be

156416 v2                                3

immediately returned to the Borrower upon such determination. All sums paid or agreed to be paid for the use, forbearance or detention of money payable under this Note shall, to the extent allowed by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note.

10.   Time of Essence.   Time is of the essence with respect to this Note and the performance of all obligations contained herein.

11.   Waiver.  B orrower h ereby w aives, t o t he f ullest e xtent p ermitted by a pplicable law, (i) all rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any state thereof, (ii) demand, presentment, protest, notice of dishonor, notice of non-payment, diligence in collection, and all other requirements necessary to charge or hold the Borrower liable on any obligations hereunder, and (iii) any further receipt for or acknowledgment of any collateral now or hereafter deposited by Borrower as security for the obligations hereunder.

12.   Binding Effect.   Lender will not by any act, delay, omission, or otherwise be deemed to have waived any of its rights or remedies under this Note or the other Loan Documents, and no waiver of any kind will be valid unless in writing and signed by Lender. The provisions of this Note will be construed without regard to the party responsible for the drafting and preparation hereof. Any provision in this Note that might be unenforceable or invalid under any law will be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision hereof. This Note and the obligations of Borrower hereunder shall be binding upon and enforceable against Borrower and its successors and assigns and will inure to the benefit of Lender and its successors and assigns, including any subsequent holder of this Note. Borrower agrees that, without releasing or impairing Borrower's liability hereunder, Lender may at any time release, surrender, substitute, or exchange any collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

13.   Document Protocols.   This Note is governed by the Document Protocols set forth in Article Nine of the Loan Agreement, which Document Protocols are incorporated by reference into this Note as if fully set forth herein.

[THE REMAINDER OF THIS PAGE LEFT BLANK INTENTIONALLY]

**IN WITNESS WHEREOF,** Borrower has executed this Note, or has caused this Note to be executed by its duly authorized representative, on the day and year first above written, with the intention that this Note to take effect as an instrument under seal.

**5300 PEACHTREE, L.P.,**
an Alabama limited partnership

By:     5300 Peachtree Partners, LLC
        an Alabama limited liability company,
        Its General Partner

        By: _Miles Hill_____
        Name: _Miles Hill_____
        Title: _Managing Member_____

                                        [Affix seal]

## THIRD NOTE MODIFICATION AGREEMENT

**THIS THIRD NOTE MODIFICATION AGREEMENT,** made and entered into as of the 21st day of March, 2007, is by and between **5300 PEACHTREE, L.P.,** an Alabama limited partnership (hereinafter, "Borrower"), and **WACHOVIA BANK, NATIONAL ASSOCIATION,** a national banking association and successor by merger to SouthTrust Bank (hereinafter, "Lender").

## R E C I T A L S:

Lender is the owner and holder of that certain Promissory Note dated as of September 30, 2003, payable by Borrower to the order of Lender in the original principal amount of $18,843,294.00, as amended by that certain First Note Modification Agreement dated as of January 31, 2006, which, among other things, increased the stated principal amount of said Promissory Note to the sum of $25,766,294.00, and as further amended by that certain Note Modification Agreement dated as of August 10, 2006 (as so amended, and as hereafter amended, modified, renewed or extended, the "Note"). Proceeds of the Loan have been disbursed to Borrower pursuant to the terms of that certain Loan Agreement dated as of September 30, 2003, by and between Borrower and Lender, as amended by that certain First Modification to Loan Agreement dated as of January 31, 2006, as further amended by that certain Second Modification to Loan Agreement dated as of July 28, 2006, as further amended by that certain Third Modification to Loan Agreement of even date herewith (as so amended, and as hereafter amended, modified, renewed or extended, the "Loan Agreement"). All capitalized terms used herein without definition shall have the respective meanings thereunto ascribed in the Note and the Loan Agreement. Borrower has requested that the maturity of the Note be extended as herein provided, and Lender has agreed to such extension upon the terms and conditions herein set forth.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the foregoing Recitals, the parties hereto agree as follows:

1. ***Recitals.*** The parties hereby acknowledge the foregoing Recitals to be true and correct in all material respects.

2. ***Extension of Maturity.*** The Term of the Note is hereby extended to November 15, 2007. Accordingly, Section 3 of the Note is hereby deleted in its entirety, and the following text is inserted in lieu thereof:

"3.    Repayment Terms:

During the period commencing on the date of this Note and ending on November 15, 2007 (the **"Term"**), the principal of and interest on this Note shall be paid as follows: ·

(i)    On October 10, 2003, and on the tenth (10th) day of each successive calendar month during the Term, Borrower shall pay to

1550715 v3

**EXHIBIT**

**D**

Lender all accrued but unpaid interest on the outstanding principal of this Note; and

(ii)    On the last day of the Term (i.e., November 15, 2007), Borrower shall pay the entire principal amount outstanding principal under this Note, together with all accrued but unpaid interest thereon and any other charges due hereunder."

3.    *Re-Advance of Principal.* Pursuant to the terms of the Loan Agreement, Lender has agreed to re-advance up to $7,773,361.00 in Loan proceeds to Borrower. All such advances shall be evidenced by, and shall be payable in accordance with the terms of, the Note.

4.    *Miscellaneous.*

(a)    This Agreement shall in all respects be governed by and construed in accordance with the Document Protocols set forth in Article 9 of the Loan Agreement, which by this reference are incorporated herein as if set forth in full.

(b)    Borrower hereby represents and warrants to Lender that it has full power and authority to enter into this Agreement, and that this Agreement constitutes the legal, valid, and binding obligation of the Borrower, enforceable in accordance with its terms.

(c)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives, and assigns.

(d)    As herein modified, the Note shall remain in full force and effect, and is hereby ratified and affirmed in all respects. Borrower confirms that it has no defenses or offsets with respect to its obligations pursuant to the Note, as herein modified. All references to the Note contained in any other Loan Document shall henceforth be deemed to refer to the Note as amended hereby.

(e)    This Agreement may be executed in any number of counterparts bearing the original signatures of one or more of the parties hereto, each of which shall for all purposes be deemed an original, but all of which, taken together, shall constitute one and the same agreement. It shall not be necessary for all parties to sign the same counterpart.

(f)    Time is of the essence in the performance and observance of all terms, covenants, conditions and agreements set forth herein.

**[No further text this page; Signature page follows.]**

**IN WITNESS WHEREOF**, the undersigned parties have caused this Agreement to be properly executed and delivered as of the day and year first above written.

**BORROWER:**

Signed, sealed and delivered in the presence of:

*T. Donald Brannan*
Unofficial Witness

*Kimiko Y Noble*
Notary Public
My Commission Expires:

[Notary Seal]

5300 PEACHTREE, L.P., an Alabama limited partnership

By:    5300 Peachtree Partners, LLC, an Alabama limited liability company, Its General Partner

By:    _____
       Miles E. Hill, Jr., Managing Member

**LENDER:**

Signed, sealed and delivered in the presence of:

*Cathy Williams*
Unofficial Witness

*Brittany C. Hamrick*
Notary Public
My Commission Expires:
_1/5/08_

[Notary Seal]

WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association

By:    _____
       Print Name:  _Terri O. Burns_
       Title:  _Assistant Vice President_

1550715 v3

3

# GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT is entered into as of the 30 day of September, 2003, by MILES E. HILL, JR. and FRED BENNETT, each being individual residents of the State of Alabama (separately and collectively referred to as "**Guarantor**") for the benefit of SOUTHTRUST BANK, an Alabama banking corporation (hereinafter referred to as "**Lender**").

## R e c i t a l s :

**5300 PEACHTREE, L.P.**, an Alabama limited partnership ("**Borrower**"), has obtained a loan in the principal amount of $18,843,294.00 (the "**Loan**") from Lender for the purpose of refinancing the acquisition of a 3.9-acre parcel of real estate located in Chamblee, DeKalb County, Georgia, and financing the construction of a 244-unit apartment facility together with related amenities and improvements thereon (the "**Property**"). The Loan shall be advanced to Borrower pursuant to the terms and conditions of a Loan Agreement of even date herewith between Borrower and Lender (the "**Loan Agreement**"), and is evidenced by a Promissory Note of even date herewith executed by Borrower and payable to the order of Lender in the stated principal amount of the Loan (the "**Note**").

Guarantor owns a legal and beneficial interest in the Borrower (either directly or indirectly), and as a condition to making the Loan, Lender has required that Guarantor execute this Agreement in order to guarantee the obligations of Borrower to Lender pursuant to the Note and the other Loan Documents. In consideration of the benefits that will accrue to Guarantor from the construction of the Property, which is made possible by Lender's extension of the Loan to Borrower, Guarantor is willing to enter into this Agreement for Lender's benefit.

NOW, THEREFORE, in consideration of the foregoing recitals, as an inducement to Lender to make the Loan to Borrower, Guarantor agrees and covenants with Lender, and represents and warrants to Lender, as follows:

1.     <u>Definitions.</u>     All capitalized terms used, but not specifically defined, in this Agreement shall have the meanings given them in the Loan Agreement.

2.     <u>Combined Minimum Liquidity Requirement.</u>   At all times until the Loan has been paid in full, Guarantor agrees with and represent to Lender that Guarantor shall maintain combined (the two named Guarantor individuals together) minimum liquid assets (cash or marketable securities) of at least Two Million and No/100 Dollars ($2,000,000.00) (the "**Combined Minimum Liquidity Requirement**").

3.     <u>Guaranteed Obligations.</u>

(a)     Guarantor hereby guarantees to Lender (i) the due, regular, and punctual payment of the Loan and all interest thereon, and the Note evidencing the Loan, and all renewals and extensions of the Loan, and all other indemnities, charges, expenses, and other indebtedness now existing and hereafter incurred by Borrower to Lender in connection with the Loan of whatever nature, and (ii) the prompt performance of all other obligations of any kind or character of Borrower to Lender pursuant to the Note, the Loan Agreement, the Security Documents, or the

EXHIBIT
E
tabbies®

other Loan Documents, including, without limitation, the obligation of Borrower to complete the Improvements in accordance with the terms and conditions of the Loan Agreement, free and clear of all liens and encumbrances (other than Permitted Encumbrances), prior to the Completion Deadline (all indebtedness and obligations described in clauses (i) and (ii) above being collectively referred to herein as the "Guaranteed Obligations"). The Guaranteed Obligations shall initially be unlimited in nature and amount, subject to the provisions of subsections (b) through (e) below, inclusive, regarding the conditional reduction of the Guaranteed Obligations.

(b)    At such time as the First Reduction Conditions are satisfied, provided that no Default or Event of Default has occurred and is continuing, the Guaranteed Obligations shall be reduced to an amount equal to (i) fifty percent (50%) of the principal amount outstanding under the Note from time to time, plus (ii) one hundred percent (100%) of accrued but unpaid interest on the entire principal amount outstanding under the Note, plus (iii) one hundred percent (100%) of all other indemnities, charges, expenses, and other indebtedness due under the Loan Documents from time to time. As used in this subsection, the term "First Reduction Conditions" means (A) Guarantor shall have submitted to Lender a Guaranty Reduction Request and Certificate in the form of Exhibit A attached hereto and made a part hereof (the "Reduction Request") duly executed and completed by Guarantor; (B) the Improvements have been completed, free of liens and encumbrances, as evidenced by Lender's approval and acceptance of all items required in Section 3.3 of the Loan Agreement; (C) Lender has determined that the Combined Minimum Liquidity Requirement is satisfied; and (D) Borrower has provided evidence acceptable to Lender that the Property has achieved a Debt Service Coverage Ratio (as defined below) of not less than 1.00 to 1.00 on an annualized basis for each month during the six (6) consecutive month period preceding the date of calculation. For purposes of this subsection and subsection (c) below, the following terms shall have the following meanings:

"Annual Debt Service" means the product of (x) the level monthly payment of combined principal and interest that would be payable calculated based on a 360-month amortization schedule of the principal amount then outstanding under the Loan at an assumed interest rate of 7.5%, times (y) twelve (12).

"Appraisal Value of the Property" shall mean the fair market value of the Property as set forth in a written appraisal of the Property, which appraisal shall be by an appraiser and otherwise in form and substance approved by Lender, which approval shall not be unreasonably withheld.

"Debt Service Coverage Ratio" shall mean the shall mean the ratio of Net Operating Income to Annual Debt Service.

"Net Operating Income" means the net operating income of the Property, as determined by Lender based on reasonable and prudent underwriting standards and in accordance with generally accepted accounting principles, with the following considerations and qualifications: (A) operating income shall include sundry, parking, and reimbursable expenses, to the extent reported on the operating statements for the Property and deemed recurring and sustainable (provided that aggregate other income shall not exceed two and one-half percent (2.5%) of the total gross income), and all extraordinary and non-recurring income shall be excluded from

operating income; (B) non-cash expenses shall be excluded from operating expenses; and (C) operating expenses, insurance, and real estate taxes shall be determined on a Stabilized Basis.

"Stabilized Basis" shall mean the annualization of payments, including the adjustments for payments that have seasonal variation, together with adjustment, as necessary for levels of occupancy and service, to reflect the level of expense that would exist upon achievement of a stabilized occupancy for properties similar in nature and in the general vicinity of the Property, as determined by Lender. Lender may rely solely upon pro forma payments estimated by Lender's appraiser (subject to Borrower's right to engage its own appraiser and contest the determination of Lender's appraiser) and other prevailing market conditions and information in determining the Stabilized Basis of any payments and such determination shall control regardless of the actual level of payments experienced by Borrower before or after the Property achieves stabilized occupancy.

The reduction of the Guaranteed Obligations pursuant to this subsection (b) shall not be effective unless and until (aa) Lender determines, in its reasonable judgment, that the First Reduction Conditions have been satisfied, and (bb) Lender has evidenced such determination by the execution and delivery of the acknowledgment contained in the Reduction Request.

(c)     At such time as the Second Reduction Conditions are satisfied, provided that no Default or Event of Default has occurred and is continuing, the Guaranteed Obligations shall be reduced to an amount equal to (i) twenty percent (20%) of the principal amount outstanding under the Note from time to time, plus (ii) one hundred percent (100%) of accrued but unpaid interest on the entire principal amount outstanding under the Note, plus (iii) one hundred percent (100%) of all other indemnities, charges, expenses, and other indebtedness due under the Loan Documents from time to time. As used in this subsection, the term "Second Reduction Conditions" means (A) Guarantor shall have submitted to Lender a Reduction Request duly executed and completed by Guarantor; (B) the First Reduction Conditions have been satisfied, as acknowledged by Lender pursuant to the provisions of subsection (b) above; and (C) Borrower has provided evidence acceptable to Lender that the Property has achieved a Debt Service Coverage Ratio (as defined below) of not less than 1.25 to 1.00 on an annualized basis for each month during the six (6) consecutive month period preceding the date of calculation. The reduction of the Guaranteed Obligations pursuant to this subsection (c) shall not be effective unless and until (aa) Lender determines, in its reasonable judgment, that the Second Reduction Conditions have been satisfied, and (bb) Lender has evidenced such determination by the execution and delivery of the acknowledgment contained in the Reduction Request.

(d)     Notwithstanding anything to the contrary in the preceding subsections of this Section 2, Guarantor shall at all times be liable and obligated to Lender hereunder for the payment to Lender of, and to save, defend and hold Lender harmless from, and to indemnify Lender from and against, any and all liabilities, obligations, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees), causes of action, suits, claims, demands and judgments of any nature or description whatsoever that might at any time be imposed upon, incurred or suffered by, or awarded against Lender as a result of any of the following:

(i)    Fraud o r i ntentional m isrepresentation b y B orrower o r G uarantor i n c onnection with obtaining the Loan or in complying with its obligations under this Loan Agreement, this Guaranty, or any other Loan Document;

(ii)    Failure by Borrower to remit to Lender insurance proceeds, condemnation awards, or other sums or payments attributable to the Property in accordance with the provisions of the Loan Agreement and the Security Documents, except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership, or similar judicial proceeding, to direct disbursement of such sums or payments;

(iii)    Failure by Borrower to apply to the payment of the Obligations on the Loan or otherwise remit to Lender, all net income from the Property (after payment of reasonable and ordinary operating expenses of the Property) received by or on behalf of Borrower following the occurrence of an Event of Default, except to the extent that Borrower did not have the legal right, because of a bankruptcy, receivership, or similar judicial proceeding, to direct the disbursement of such sums;

(iv)    Failure by Borrower to pay any tax, assessment, insurance premium, ground rent, or other similar charge (including any interest and penalties thereon) against or with respect to all or any portion of the Property, or any other charge required to preserve the priority of the lien and security interest of Lender in the Property or to protect the value of the Property, except to the extent owed with respect to a period during which Lender owns the fee simple title to the Property or has direct control of the cash flow from the Property and further except to the extent not paid as the sole result of Lender's negligent failure to pay such tax, assessment, premium, ground rent, or other charge when Borrower has made all required reserve deposits with respect thereto in accordance with the requirements of the Loan Agreement;

(v)    Failure by Borrower to pay any valid mechanics, materialmen, or similar claimants' liens arising from work performed or materials furnished in connection with the Property prior to any sale or foreclosure thereof pursuant to the terms of the Security Documents;

(vi)    The application by B orrower of any a nd all tenant security d eposits or p repaid rents or other charges (including any interest earned or due thereon) under the Leases in a manner not specifically authorized by the Loan Documents, or the failure by Borrower to remit such deposits or rents to Lender upon Lender's demand therefor following the occurrence of an Event of Default;

(vii)    Any waste of or damage to the Property caused by the willful or wanton acts or omissions of Borrower·or its agents, in which case the "loss" shall be deemed to include all costs of repair, replacement, or rehabilitation of the Property;

(viii)    Any and all loss or damage to the Property caused by fire or other insurable casualty to the extent that available insurance proceeds fail to cover the entire loss and damages due to Borrower's failure to maintain the insurance coverages required by the Loan Documents (including by reason of any deductible);

(ix)    The willful or grossly negligent violation by Borrower of any Legal Requirement; and

(x)    All costs and expenses incurred by Lender (including, without limitation, attorneys' fees and costs) in connection with the filing of any bankruptcy or insolvency proceeding by or against Borrower or the Property.

(e)    Interest shall accrue on Guarantor's payment obligation set forth in this Section 2 at the Default Rate specified in the Note from the time demand is made upon Guarantor for payment hereunder until the date that such payment is received. In the event that the Guaranteed Obligations are reduced pursuant to subsections (b) or (c) above, the Guaranteed Obligations, as so reduced, shall be determined without credit, offset, or regard for any amounts received by Lender in satisfaction of the Obligations after the occurrence of an Event of Default from any source, including direct payment by Borrower or any other Person, or amounts received as a result of or the liquidation of, or enforcement of remedies against, any collateral now or hereafter given as security for the Loan. In addition, the obligations and liability of Guarantor pursuant to subsection (b) or (c) above, as applicable, on the one hand, and pursuant to subsection (d) above, on the other hand, shall at all times be and remain independent and separate, with it being the intent of the parties that Guarantor's obligations and liability under subsection (d) shall not be limited in any respect by the provisions of subsection (b) or (c), and that Guarantor shall not be entitled to a credit against Guarantor's obligations under subsection (b) or (c), as applicable, for any consideration paid or conferred by Guarantor to Lender under subsection (d).

4.    <u>Obligations Unconditional</u>. This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person (including, without limitation, other guarantors, if any), nor against the collateral for the Loan. Guarantor waives any right to require that an action be brought against Borrower or any other person or to require that resort be had to any collateral for the Loan or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person. In the event, on account of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"), or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, Borrower shall be relieved of the Obligations, Guarantor shall nevertheless be fully liable therefor. Upon the occurrence of an Event of Default under the Loan Documents, Lender shall have the right to enforce its rights, powers and remedies (including, without limitation, foreclosure of all or any portion of the collateral for the Loan) thereunder or hereunder, in any order, and all rights, powers and remedies available to Lender in such event shall be non-exclusive and cumulative of all other rights, powers and remedies provided thereunder or hereunder or by law or in equity. If the Obligations are partially paid or discharged by reason of the exercise of any of the remedies available to Lender, this Agreement shall nevertheless remain in full force and effect, and Guarantor shall remain liable for all remaining Obligations, even though any rights which Guarantor might have against Borrower might be destroyed or diminished by the exercise of any such remedy.

5.    <u>Reinstatement of Obligations</u>. If at any time all or any part of any payment made by Guarantor or received by Lender from Guarantor under or with respect to this Agreement is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Guarantor or Borrower), then the obligations of Guarantor hereunder shall, to the extent of the payment rescinded or returned, be deemed to have

continued in existence, notwithstanding such previous payment made by Guarantor or receipt of payment by Lender, and the obligations of Guarantor hereunder shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment by Guarantor had never been made.

6.    <u>Waivers by Guarantor</u>.  To the extent permitted by law, Guarantor hereby waives and agrees not to assert or take advantage of:

(a)    Any right to require Lender to proceed against Borrower, whether or not after notice and within any time period prescribed by Section 10-7-24 of the Official Code of Georgia Annotated, or any other similar law, or any other person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power or under any other agreement before proceeding against Guarantor hereunder;

(b)    Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons, or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons;

(c)    Demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notices (other than as may be expressly herein required) of any kind, or the lack of any thereof, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender;

(d)    Any defense based upon an election of remedies by Lender;

(e)    Any right or claim or right to cause a marshaling of the assets of Guarantor;

(f)    Any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Agreement;

(g)    Any duty on the part of Lender to disclose to Guarantor any facts Lender may now or hereafter know about Borrower or the Property, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or have reason to believe that such facts are unknown to Guarantor or have a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower, of the condition of the Property, and of any and all circumstances bearing on the risk that liability may be incurred by Guarantor hereunder;

(h)    Any lack of notice of disposition or of manner of disposition of any collateral for the Loan;

(i)    Any invalidity, irregularity, or unenforceability, in whole or in part, of any one or more of the Loan Documents;

(j)    Any lack of commercial reasonableness in dealing with the collateral for the Loan;

(k)    Any deficiencies in the collateral for the Loan or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed;

(l)    An assertion or claim that the automatic stay provided by the Bankruptcy Code (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay affecting Borrower or any of its assets provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter required, which Lender may have against Guarantor or the collateral for the Loan; and

(m)    Any modifications of the Loan Documents or any obligation of Borrower relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Code or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise.

7.    <u>Full Recourse</u>.  All of the terms and provisions of this Agreement are recourse obligations of Guarantor and not restricted by any limitation on personal liability.  Guarantor hereby acknowledges that Lender would not make the Loan but for the unsecured personal liability undertaken by Guarantor herein.

8.    <u>Joint and Several Liability</u>.  If the reference in this Agreement to "Guarantor" shall refer to more than one person or entity, then all agreements, covenants, representations, and other obligations set forth in this Agreement shall constitute joint and several obligations of all persons and entities comprising Guarantor.

9.    <u>Survival.</u>  This Agreement shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the exercise of any remedy by Lender under the Security Documents or any of the other Loan Documents, including, without limitation, any foreclosure of the Security Documents or Lender's acceptance of a deed in lieu thereof, even if, as a part of such remedy, the Loan is paid or satisfied in full.

10.    <u>No Subrogation; No Recourse Against Lender</u>.  Notwithstanding the satisfaction by Guarantor of any liability hereunder, Guarantor shall not have any right of subrogation, contribution, reimbursement, or indemnity whatsoever or any right of recourse to or with respect to the assets or property of Borrower or to any collateral for the Loan unless and until Guarantor fully satisfies the payment of the Loan, all other amounts due under the Loan Documents, and the costs and expenses for which Lender is indemnified hereunder.  In connection with the foregoing, Guarantor expressly waives any and all rights of subrogation to Lender against Borrower (except as expressly provided above), and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any right to participate in any collateral for the Loan.  In addition to and without in any way limiting the foregoing, Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to

all indebtedness of Borrower to Lender (including, without limitation, interest accruing on any principal indebtedness due from Borrower to Lender from and after the filing of any petition for relief under the Bankruptcy Code, notwithstanding any contrary practice, custom, or ruling in proceedings under the Bankruptcy Code generally), and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the collateral from the Loan. Further, Guarantor shall not have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Agreement or under the provisions of any of the Loan Documents.

11.    Reservation of Rights.  Nothing contained in this Agreement shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Guarantor, or any other party pursuant to (i) the Environmental Indemnity Agreement of even date herewith executed by Borrower and Guarantor for the benefit of Lender and/or (ii) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

12.    Financial Statements.  Guarantor hereby agrees, as a material inducement to Lender to make the Loan to Borrower, to furnish to Lender promptly upon demand by Lender current and dated financial statements detailing the assets and liabilities of Guarantor certified by Guarantor, in form and substance reasonably acceptable to Lender.

13.    Rights Cumulative.  Lender's rights under this Agreement shall be in addition to all rights of Lender under the Loan Agreement, the Note, the Security Documents, and the other Loan Documents.

14.    No Limitation on Liability.  Guarantor hereby consents and agrees that Lender may at any time and from time to time without further consent from Guarantor do any of the following events, and the liability of Guarantor under this Agreement shall be unconditional and absolute and shall in no way be impaired or limited by any of the following events, whether occurring with or without notice to Guarantor or with or without consideration: (i) any extensions of time for performance required by any of the Loan Documents or extension or renewal of the Note; (ii) any sale, assignment or foreclosure of the Note, the Security Documents, or any of the other Loan Documents or any sale or transfer of the Property; (iii) any change in the composition of Borrower, including, without limitation, the withdrawal or removal of Guarantor from any current or future position of ownership, management or control of Borrower; (iv) the accuracy or inaccuracy of the representations and warranties made by Guarantor herein or by Borrower in any of the Loan Documents; (v) the release of Borrower or of any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise; (vi) the release or substitution in whole or in part of any security for the Loan; (vii) Lender's failure to record any of the Security Documents or to file any financing statement (or Lender's improper recording or filing thereof) or to otherwise perfect, protect, secure or insure any lien or security interest given as security for the Loan; (viii) the modification of the terms of any one or more of the Loan Documents; or (ix) the taking

or failure to take any action of any type whatsoever. No such action which Lender shall take or fail to take in connection with the Loan Documents or any collateral for the Loan, nor any course or dealing with Borrower or any other person, shall limit, impair or release Guarantor's obligations hereunder, affect this Agreement in any way or afford Guarantor any recourse against Lender. Nothing contained in this Section shall be construed to require Lender to take or refrain from taking any action referred to herein.

15.    Successive Actions. A separate right of action hereunder shall arise each time Lender acquires knowledge of any matter indemnified or guaranteed by Guarantor under this Agreement. Separate and successive actions may be brought hereunder to enforce any of the provisions hereof at any time and from time to time. No action hereunder shall preclude any subsequent action, and Guarantor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

16.    Representations and Warranties. To induce Lender to make the Loan to Borrower, Guarantor represents and warrants to Lender that, as of the date hereof:

(a)    Enforceability. This Agreement and each of the other Loan Documents to which Guarantor is a party (collectively, the "Guarantor Documents") have been duly executed and delivered by Guarantor and constitute the legal, valid, and binding obligation of Guarantor, enforceable against Guarantor in accordance with their respective terms, except as such enforceability may be affected by applicable conservatorship, bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally. The Guarantor Documents are not subject to any right of rescission, set-off, counterclaim, or defense by Guarantor, including the defense of usury, and Guarantor has not asserted any right of rescission, set-off, counterclaim, or defense with respect thereto.

(b)    Intentionally deleted.

(c)    Power and Authority. Guarantor has the requisite power, authority, and capacity, as the case might be, to execute and deliver the Guarantor Documents, to incur and perform the Obligations, and to carry out the transactions contemplated by the Guarantor Documents.

(d)    Intentionally deleted.

(e)    No Conflicts. Neither the execution and delivery of the Guarantor Documents, nor the fulfillment of or compliance with the terms and conditions of the Guarantor Documents, nor the performance of the Obligations (i) conflicts with or result in (or will conflict with or result in) any breach or violation of any Legal Requirement enacted or issued by any Governmental Authority or other agency having jurisdiction over Guarantor, or any judgment or order applicable to Guarantor, or to which Guarantor is subject; or (ii) requires (or will require) the consent or approval of any creditor of Guarantor, any Governmental Authority, or any other Person except such consents or approvals that have already been obtained.

(f)    Pending Litigation or other Proceedings. There is no pending or, to the best knowledge of Guarantor, threatened action, suit, proceeding, or investigation, at law or in equity, before any court, board, body, or official of any Governmental Authority or arbitrator against or affecting Guarantor, which, if decided adversely to Guarantor, would have, or may reasonably be

expected to have, a Material Adverse Effect. Guarantor is not in default with respect to any order of any Governmental Authority.

(g)   Solvency. Guarantor is not insolvent and will not be rendered insolvent by the transactions contemplated by the Guarantor Documents, and after giving effect to such transactions, Guarantor will not be left with an unreasonably small amount of capital with which to engage in Guarantor's business or undertakings, nor will Guarantor have incurred, have intended to incur, or believe that Guarantor has incurred, debts beyond Guarantor's ability to pay such debts as they mature. Guarantor did not receive less than a reasonably equivalent value in exchange for incurrence of the Obligations. There (i) is no contemplated, pending or, to the best of Guarantor's knowledge, threatened bankruptcy, reorganization, receivership, insolvency, or like proceeding, whether voluntary or involuntary, affecting Guarantor and (ii)has been no assertion or exercise of jurisdiction over Guarantor by any court empowered to exercise bankruptcy powers.

(h)   Financial Information. The financial statements of Guarantor which have been furnished to Lender are complete and accurate in all material respects and present fairly the financial condition of Guarantor, and there are no liabilities, direct or indirect, fixed or contingent, as of the respective dates of such financial statements which are not reflected therein or in the notes thereto or in a written certificate delivered with such statements. Since the date of the most recent of such financial statements, no event has occurred which would have, or may reasonably be expected to have, a Material Adverse Effect, and there has not been any material transaction entered into by Guarantor other than transactions in the ordinary course of business. Guarantor has filed all federal, state, and local tax returns that are required to be filed and has paid, or made adequate provision for the payment of, all taxes that have or may become due pursuant to such returns or to assessments received by Guarantor.

(i)   No Reliance. Guarantor understands the nature and structure of the transactions contemplated by the Guarantor Documents, is familiar with the provisions of all of the documents and instruments relating to such transactions, understands the risks inherent in such transactions, and has not relied on Lender for any guidance or expertise in analyzing the financial or other consequences of the transactions contemplated by the Guarantor Documents and the other Loan Documents or otherwise relied on Lender in any manner in connection with interpreting, entering into, or otherwise in connection with the Guarantor Documents or any of the matters contemplated thereby.

(j)   Borrower's Representations and Warranties. Guarantor has had an opportunity to review the Loan Documents, and none of the representations and warranties of Borrower set forth therein are false or misleading in any material respect.

17.   Expenses.   If at any time or times hereafter Lender employs counsel to commence, defend, intervene in, file a petition, complaint, answer, motion, or other pleadings or to take any other action in or with respect to any suit or proceeding relating to this Agreement or any other agreement, instrument, or document heretofore, now, or hereafter executed by Guarantor and delivered to Lender with respect to Borrower or the Obligations, or to represent Lender in any litigation with respect to the affairs of Guarantor or to enforce any rights of Lender or obligations of Guarantor or any other person, firm, or corporation who might be obligated to

Lender by virtue of this Agreement or any other agreement, document, or instrument heretofore, now, or hereafter delivered to Lender by or for the benefit of Guarantor with respect to Borrower or the Obligations, then in any such events, all of the attorneys' fees actually incurred at standard hourly rates arising from such services, and any expenses, costs, and charges relating thereto, will constitute additional obligations of Guarantor payable on demand.

18.    Notices.  All notices, consents, approvals, statements, requests, reports, demands, instruments or other communications to be made, given or furnished pursuant to, under or by virtue of this Agreement (a "notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address, (ii) three (3) Business Days after the same is deposited in the United States mail as first class registered or certified mail, return receipt requested, postage prepaid, or (iii) one Business Day after the date of delivery of such notice to a nationwide, reputable commercial courier service:

Lender:

SouthTrust Bank
420 North Twentieth Street
SouthTrust Tower - 11th Floor
Birmingham, Alabama 35203
Attention:  Commercial Real Estate Loan Dept.

*with copy to* (which alone shall not constitute notice):

William T. McKenzie, Esq.
Burr & Forman LLP
One Georgia Center, Suite 1200
600 West Peachtree Street, NW
Atlanta, Georgia 30308

Guarantor:

For each Guarantor:

Miles E. Hill, Jr.
730 N. Dean Road, Suite 200
Auburn, Alabama 36830

Fred Bennett
730 N. Dean Road, Suite 200
Auburn, Alabama 36830

*with copy to* (which alone shall not constitute notice):

Russell C. Balch, Esq.
Akridge & Balch, P.C.
730 N. Dean Road, Suite 300
Auburn, Alabama 36830

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties. Rejection or refusal to accept, or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed to be receipt of any such notice. Any notice to an entity shall be deemed to be given on the date specified in this Section without regard to when such notice is delivered by the entity to the individual to whose attention it is directed and without regard to the fact that proper delivery may be refused by someone other than the individual to whose attention it is directed. If a notice is received by an entity, the fact that the individual to whose attention it is directed is no longer at such address or associated with such entity shall not affect the effectiveness of such notice. Notices may be given on behalf of any party by such party's attorneys.

19.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid or unenforceable under the applicable l aw o f a ny j urisdiction w ith r espect t o a ny p erson o r c ircumstance, s uch p rovision shall be ineffective to the extent of such prohibition, invalidity or unenforceability, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction or with respect to other persons or circumstances. To the extent permitted by applicable law, Guarantor hereby waives any provision of law that renders any provision hereof prohibited, invalid or unenforceable in any respect.

20.    Binding Obligations.  This Agreement shall be binding upon Guarantor and the successors, assigns, heirs and personal representatives of Guarantor, as the case may be, and shall inure to the benefit of Lender and all subsequent holders or beneficiaries of this Agreement and their respective officers, directors, employees, shareholders, agents, successors and assigns. Nothing in this Agreement, whether express or implied, shall be construed to give any person (other than the parties thereto and their permitted successors and assigns and as expressly provided therein) any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenants, conditions or provisions contained herein.

21.    No Oral Modifications.  This Agreement, and any of the provisions hereof, cannot be altered, modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of Guarantor or Lender, but only by an agreement in writing signed by the party against whom enforcement of any alteration, modification, amendment, waiver, extension, change, discharge or termination is sought.

22.    Entire Agreement.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter thereof and supersedes all prior written and oral agreements and understandings with respect to such subject matter.

23.    Jurisdiction, Court Proceedings.  Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, (i) submits to personal, nonexclusive jurisdiction in the State of Georgia with respect to any suit, action, or proceeding by any person arising from, relating to, or in connection with this

Agreement or the Loan, (ii) agrees that any such suit, action, or proceeding may be brought in any state or federal court of competent jurisdiction sitting in the State of Georgia, and (iii) submits to the jurisdiction of such courts. Guarantor, to the fullest extent permitted by law, hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, further agrees that it shall not bring any action, suit, or proceeding in any forum other than in the state or federal courts of the State of Georgia (but nothing herein shall affect the right of Lender to bring any action, suit, or proceeding in any other forum), and irrevocably agrees not to assert any objection which it may ever have to the laying of venue of any such suit, action, or proceeding in any federal or state court located in Georgia and any claim that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

24.     Waiver of Counterclaim.  Guarantor hereby knowingly waives the right to assert any counterclaim, other than a compulsory or mandatory counterclaim, in any action or proceeding brought against Guarantor by Lender.

25.     Waiver of Jury Trial.  Guarantor and Lender, to the full extent permitted by law, each hereby knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, waives, relinquishes, and forever forgoes hereby the right to a trial by jury in any action or proceeding, including, without limitation, any tort action, brought by any of them against the other based upon, arising out of, or in any way relating to or in connection with this Agreement and the Loan, or any course of conduct, act, omission, course of dealing, statements (whether verbal or written) or actions of any person (including, without limitation, such person's directors, officers, partners, members, employees, agents or attorneys, or any other persons affiliated with such person), in connection with the Loan or this Agreement, including, without limitation, in any counterclaim which Guarantor may be permitted to assert thereunder or which may be asserted by Lender against Borrower or Guarantor, whether sounding in contract, tort, or otherwise.  This waiver by Guarantor of the right to a jury trial is a material inducement for Lender to make the Loan.

26.     No Waivers by Lender.  No delay or omission of Lender in exercising any right or power accruing upon any default under this Agreement shall impair any such right or power or shall be construed to be a waiver of any default under this Agreement or any acquiescence therein, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  Acceptance of any payment after the occurrence of a default under this Agreement shall not be deemed to waive or cure such default under this Agreement; and every power and remedy given by this Agreement to Lender may be exercised from time to time as often as may be deemed expedient by Lender.  Guarantor hereby waives any right to require Lender at any time to pursue any remedy in Lender's power whatsoever.

27.     Time of the Essence.  Time shall be of the essence in the performance of all obligations of Guarantor under this Agreement.

28.     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Georgia, except to the extent that the applicability of

any of such laws may now or hereafter be preempted by federal law, in which case such federal law shall so govern and be controlling.

29.    Counterparts.    This Agreement may be executed in any number of separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which, collectively and separately, shall constitute one and the same document. All signatures need not be on the same counterpart. The failure of any party thereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

30.    Exhibits Incorporated; Headings.    The information set forth on the cover of this Agreement, the table of contents, the headings, and the exhibits annexed thereto, if any, shall be deemed to be incorporated therein as a part thereof with the same effect as if set forth in the body thereof. The headings and captions of the various articles, sections, and paragraphs of this Agreement are for convenience of reference only and shall not be construed as modifying, defining, or limiting, in any way, the scope or intent of the provisions thereof.

31.    Interpretation.    No provision of this Agreement shall  be construed against or interpreted to the disadvantage of any party thereto by any court or other governmental or judicial authority by reason of such party's having or being deemed to have structured or dictated such provision.

32.    Release of any Party.    Any one or more parties liable upon or in respect of this Agreement may be released without affecting the liability of any party not so released.

33.    Attorneys' Fees.    Wherever it is provided in this Agreement that Guarantor pay any costs and expenses, such costs and expenses shall include, without limitation, all reasonable attorneys', paralegal and law clerk fees and disbursements, including, without limitation, fees and disbursements at the pre-trial, trial and appellate levels which are actually incurred or paid by Lender at standard billable rates; provided that the foregoing reference to "reasonable" fees and disbursements (and any other such references in this Agreement) shall be deemed to include only such fees and disbursement actually incurred at normal billing rates.

34.    Method of Payment.    All amounts required to be paid by any party to this Agreement to any other party shall be paid in such freely transferable coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

*[THE REMAINDER OF THIS PAGE WAS LEFT BLANK INTENTIONALLY]*

IN WITNESS WHEREOF, Guarantor has executed this Agreement under seal as of the day and year first above written.

_____ [Seal]
MILES E. HILL JR., Individually

_____ [Seal]
FRED BENNETT, Individually

# EXHIBIT A

## GUARANTY AGREEMENT

### Form of Guaranty Reduction Request and Certificate

SouthTrust Bank
420 North 20th Street
Birmingham, Alabama 35203
Attention:  Commercial Real Estate Department

Re:    Guaranty Agreement dated _____, 200__ (the "Guaranty"), executed by Miles Hill and Fred Bennett (collectively "Guarantor") in favor of SouthTrust Bank ("Lender") regarding Loan to 5300 Peachtree, L.P.

Ladies and Gentlemen:

The undersigned Guarantor hereby requests that the Guaranteed Obligations (as defined in the Guaranty) be reduced as provided in Section : 2(b) : 2(c) of the Guaranty.  In support of said request, Guarantor certifies to Lender as follows:

1.    Upon execution and delivery of this Request and Certificate, the : First Reduction Conditions : Second Reduction Conditions set forth in the Guaranty have been satisfied and completed, except as approved in writing by Lender.

2.    No Default or Event of Default has occurred and is continuing.

3.    All representations and warranties of Guarantor and Borrower contained in the Guaranty, the Loan Agreement, or in the other Loan Documents (other than those representations and warranties which are, by their terms, expressly limited to the date made or given) are true and correct in all material respects with the same effect as those such representations and warranties had been made on the date of this Request and Certificate. No material adverse change in the representations made or information heretofore supplied by or on behalf of Guarantor or Borrower in connection with the Loan and the Loan Documents as to (i) the composition, structure, finances, business operations, credit, prospects or financial condition of Borrower or Guarantor, (ii) the rental income, condition, or ownership of the Property, and (iii) all other features of the transactions contemplated under the Loan Documents.

4.    As of the date hereof, Guarantor has no defense, claim, counterclaim, setoff, or right of recoupment against or with regard to the Guaranteed Obligations.

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty Reduction Request and Certificate as of the _____ day of _____, 200__.


Name: _____

## ACKNOWLEDGMENT OF LENDER

The undersigned Lender hereby acknowledges and agrees that (i) the First Reduction Conditions : Second Reduction Conditions have been satisfied and completed and (ii) effective as of the date of Lender's execution of this Acknowledgment, the Guaranteed Obligations have been reduced as provided in Section : 2(b) : 2(c) of the Guaranty.

IN WITNESS WHEREOF, Lender has executed and delivered this Acknowledgment as of the _____ day of _____, 200__.

**SOUTHTRUST BANK**

By:_____
Name: _____
Title: _____

EXHIBIT

F

Wachovia Corporation
Risk Management Division
AL0413
420 North 20th Street, 7th Floor
Birmingham, AL 35203





**WACHOVIA**

December 4, 2007

**VIA OVERNIGHT MAIL**

5300 Peachtree, L.P.
c/o Charter Companies
730 North Dean Road, Suite 200
Auburn, AL  36830
Attn:  Miles Hill

Miles E. Hill, Jr.
730 North Dean Road, Suite 200
Auburn, AL  36830

Fred Bennett
730 North Dean Road, Suite 200
Auburn, AL  36830

> **Re:**    **$25,766,294 Construction Loan for 5300 Peachtree Condominiums**

Gentlemen:

Reference is hereby made to that certain Loan Agreement dated as of September 30, 2003, by and between Borrower and Lender, as amended by that certain First Modification to Loan Agreement dated as of January 31, 2006, as further amended by that certain Second Modification to Loan Agreement dated as of July 28, 2006, as further amended by that certain Third Modification to Loan Agreement (the "Third Modification") dated as of March 21, 2007 (as so amended, the "Loan Agreement").  All capitalized terms used herein without definition shall have the respective meanings set forth in the Loan Agreement and the other Loan Documents therein described.

I have been informed by counsel that Borrower will be wiring the net settlement proceeds derived from the M&K Plumbing litigation in the amount of $454,000 to Wachovia.  As you know, those proceeds were pledged to Wachovia pursuant to the terms of the Third Modification.  I am pleased that the Borrower has agreed to honor its obligation in that regard, however, Wachovia still has not received the proceeds.  Please ensure that those proceeds are tendered as soon as possible.

As you are aware, the Loan matured on November 15, 2007, and all obligations under the Loan Documents are now due and payable in full, including all outstanding principal, accrued

5300 Peachtree, L.P.
Miles E. Hill, Jr.
Fred Bennett
December 4, 2007
Page 2

_____

and unpaid interest, the Late Fee, the Exit Fee and any other charges due under the terms of the Loan Documents.

Please be on notice that the provisions of the Loan Documents relative to the payment of attorney's fees in addition to the due and owing principal, interest, and other charges shall be enforced, and you have ten (10) days from the date of receipt of this letter to pay all amounts owing thereunder without incurring liability for the attorney's fees. The total amount due and owing under the Note as of December 3, 2007 is principal in the amount of $21,348,848.04, plus accrued and unpaid interest in the amount of $700,013.33, the Late Fee of $996,000.00, the Exit Fee of $500,000.00 and other late charges of $483.73 for a total outstanding balance of $23,545,345.10. Interest will continue to accrue thereafter at the applicable per diem rate under the Loan Documents. This notice is provided pursuant to O.C.G.A. § 13-1-11.

Please contact me to obtain updated payoff information as of the date you intend to pay the Loan.

This letter is not an attempt to describe all Defaults or Events of Default that may have occurred and are outstanding under the Loan Agreement or other Loan Documents. No Defaults or Events of Default are waived by Wachovia and all rights and remedies under the Loan Documents and otherwise available are reserved.

Very truly yours,

D. Andrew Raine

cc:     T. Daniel Brannan, Esq.
        William J. Sheppard, Esq.
        Morris, Manning & Martin, LLP
        1600 Atlanta Financial Center
        3343 Peachtree Road, NE
        Atlanta, Georgia 30326

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602001837
Cashier ID: brobinso
Transaction Date: 12/18/2007
Payer Name: BURR AND FORMAN LLP
------------------------------------
CIVIL FILING FEE
  For: BURR AND FORMAN LLP
  Case/Party: D-ALM-3-07-CV-001097-001
  Amount:        $350.00
------------------------------------
CHECK
  Check/Money Order Num: 306672
  Amt Tendered:  $350.00
------------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00

WACHOVIA BANK V. 5300 PEACHTREE LP
ET AL